# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | |
|---|---|
| **PREMIER BOILER & COMBUSTION, LLC,** | |
| Plaintiff, | **DOCKET NO. 2:22-CV-718-AMM** |
| v. | |
| **PAUL ISBELL and INDUSTRIAL BOILER & MECHANICAL, INC.,** | **JURY DEMAND** |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff Premier Boiler & Combustion, LLC ("Premier"), through counsel and for its Second Amended Complaint against Defendant Paul Isbell ("Isbell") and Defendant Industrial Boiler & Mechanical, Inc. ("IB&M") (collectively "Defendants"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Premier is a Georgia limited liability company, registered to do business in this state, with a principal place of business located at 788 Old Mill Road, Ringgold, GA 30736. Its two members are natural persons who are citizens of Georgia. Premier is thus a citizen of Georgia.

2. Isbell is a citizen of Alabama, and he may be served with process at 3020 Brakefield Drive, Fultondale, AL 35068.

3. IB&M is a Tennessee corporation qualified to do business in this state, and it may be served with process care of its registered agent, CT Corporation System, at 2 North Jackson Street, Suite 605, Montgomery, AL 36104. IB&M is a citizen of Tennessee because it was formed in Tennessee, and it maintains its headquarters in Tennessee.

4. This Court has general personal jurisdiction over Isbell because Isbell is a citizen of Alabama.

5. This Court has specific personal jurisdiction over both Defendants because much of the conduct giving rise to this action occurred in Alabama and relates to Defendants' contacts with Alabama. This conduct includes IB&M's business operations in Birmingham, Isbell's execution of the contract at issue in Alabama, Isbell's performance of his job duties for Premier in Birmingham, Defendants' misappropriation of trade secrets in Alabama, Defendants' solicitation of Premier's employees and customers with those misappropriated trade secrets in Alabama, and Isbell's employment with IB&M in Birmingham. Further, Defendants purposefully availed themselves of the privilege of conducting business in Alabama by opening an office in Birmingham and hiring Isbell to work there. Finally, the exercise of personal jurisdiction over Defendants comports with traditional notions of fair play and substantial justice.

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy, excluding interest and costs, exceeds $75,000.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this cause of action arose in this district.

**FACTS**

8. Premier employed Isbell as its Regional Sales Manager in Birmingham from April 16, 2020 to February 18, 2022. Isbell then quit and started working for IB&M, Premier's direct competitor.

9. As Regional Sales Manager, Isbell acted as Premier's face in Birmingham, where he was directly responsible for managing Premier's Birmingham operations and directly interfacing with Premier's customers.

10. Further, as Premier's Regional Sales Manager, Isbell developed contact information with key individuals that serve as vendors or customers for Premier.

11. Isbell also had access to Premier's sensitive, confidential, and proprietary information, including Premier's marketing strategies and plans, distribution plans, business strategies and plans, job cost data, pricing margins, financial records, customer lists, customer contact information, vendor information, purchase orders, customer sales records, product development records, employee salary numbers, and profit margins (collectively the "Trade Secrets").

12. Although he was an at-will employee, the terms of Isbell's employment relationship were expressly governed by the Employee Handbook (the "Handbook"), which he expressly acknowledged receiving and reviewing on June 22, 2020. Premier attaches a true and correct copy of the Handbook as **Exhibit 1** and incorporates it here by reference.

13. The Handbook contains several provisions relevant to this dispute. For example, the Handbook outlines a certain code of ethics that employees must follow:

> **Ethics Code**
>
> We expect that officers, directors, and employees will not knowingly misrepresent the company and will not speak on behalf of the company unless specifically authorized. The confidentiality of trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) about the company or operations, or that of our customers or partners, is to be treated with discretion and only disseminated on a need-to-know basis (see policies relating to privacy).

14. Recognizing the importance of maintaining the secrecy of the Trade Secrets, "All content maintained in [Premier] IT resources and communications systems are the property of [Premier]."

15. Premier engages in monitoring, interception, and the review of data that passes through its network to protect, including but not limited to, the following items:

> company trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks.)…

16. The Handbook contemplates that Isbell will gain access to certain proprietary information belonging to Premier, the Trade Secrets):

> **Confidentiality and Nondisclosure of Trade Secrets**
>
> As a condition of employment, Premier Boiler & Combustion, LLC employees are required to protect the confidentiality of company trade secrets, proprietary information, and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the company. Access to this information should be limited to a "need to know" basis and should not be used for personal benefit, disclosed, or released without prior authorization from management.

17. Finally, the Handbook provides that a violation of the confidentiality and nondisclosure of Trade Secrets section may subject a violator to civil liability.

18. Premier spent significant time, energy, and resources developing the Trade Secrets, including its financial sales reports, marketing and business strategies and plans, product development, and customer lists, which derive significant independent economic value from being generally unknown to, and not being readily ascertainable via proper means by, other persons who can obtain economic value from its disclosure or use.

19. The Trade Secrets are included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process.

20. The Trade Secrets are not publicly known, and they are not generally known in Premier's trade or business, and they cannot be readily ascertained or derived from publicly available information.

21. Premier engages in reasonable efforts to maintain the secrecy of its Trade Secrets, including providing its employees with an employee handbook in which Premier informs its employees that certain materials, including Trade Secrets, are to be kept confidential.

22. Premier restricts access to its confidential information and Trade Secrets to only those employees who are on a need-to-know basis.

23. As discussed above, Isbell acted as Premier's face in Birmingham, where he had access to all Premier's Trade Secrets, including its financial data, daily job cost reports, invoices, and as he was responsible for hiring employees in Birmingham, he knew each Birmingham Premier employee's salary.

24. In early 2022, without Premier's knowledge, Isbell began negotiating a new position with Premier's direct competitor, IB&M.

25. Isbell's last day of employment with Premier was February 18, 2022.

26. Unknown to Premier, prior to his last day, Isbell began misappropriating Trade Secrets for his own benefit, including for use at IB&M. For

example, Isbell took customer sales records, customer contact information, purchase orders, invoices, job quotes, materials reflecting profit margins, and other Trade Secrets with him.

27. Isbell also forwarded Trade Secrets to his personal email address from his Premier email address.

28. Premier also discovered that prior to his departure date, Isbell deliberately underbid projects at Russell Medical Center, Grayson Lumber, and Harmony Elementary.

29. Premier is an authorized factory representative for certain companies' equipment, including the equipment used for the Russell Medical Center and Harmony Elementary projects, and IB&M is not similarly qualified as a representative for those projects, so it could not quote those projects.

30. Isbell also underquoted the project at Grayson Lumber, but it was not a factory representative job.

31. Isbell not only underquoted the Harmony Elementary project, but he also failed to adequately supervise the installation, and due to his inattention, Premier had to send additional employees to correct the previous work performed.

32. On information and belief, Isbell intentionally underquoted these projects to damage Premier.

33. After Isbell left his employment with Premier, Premier went to the desk area Isbell previously used and discovered numerous empty files which formerly contained Trade Secrets.

34. Premier then made demand on Isbell to return the materials. Premier attaches a complete copy of the text message exchange between itself and Isbell as collective **Exhibit 2.**

35. In the text messages, Isbell acknowledged that he had Premier's Trade Secrets in his possession, including in a file cabinet in his house.

36. Isbell then returned with some of the Trade Secrets to Premier's office, and on video, replaced some of the materials he misappropriated, but before he left, he proceeded to take pictures of each document he was returning.

37. Not only did Isbell take pictures of the Trade Secrets he was returning, but he did not return all the Trade Secrets he took.

38. Accordingly, Isbell still retains access to each Trade Secret he took.

39. Further, after Isbell made his fake drop off at the office, Premier discovered that Isbell and/or other individuals, had taken over $1,600.00 worth of power tools stored in trucks utilized by Premier.

40. On information and belief, Isbell and/or other individuals have utilized these tools on behalf of IB&M.

41. Isbell and IB&M have been utilizing the Trade Secrets to solicit customers of Premier to utilize IB&M's services.

42. In addition to utilizing the Trade Secrets to solicit customers of Premier to utilize IB&M's services, IB&M has in at least one instance stolen a job from Premier.

43. Premier had a contractual job to retube a boiler at Diamon Rubber Products.

44. It planned on staffing the project with Scott Brown and Andrew Phillips, who were expected to perform the project the weekend of February 18, 2022, but they quit that week and went to work for IB&M.

45. On or about February 25, 2022, Premier's employees came to the job site to find Scott Brown, Andrew Philips, and IB&M employees performing the job.

46. Scott Brown and Andrew Phillips did not tell Diamond Rubber they now worked for IB&M, yet they completed the job for IB&M, and they proceeded to tell the Premier employees it was now an IB&M job.

47. Further, on information and belief, IB&M lied to the customer by saying that they were in fact Premier, and Premier was still doing the job.

48. Once Diamond Rubber determined that IB&M had hoodwinked it, it informed Premier it did not want to be involved in the dispute between IB&M and Premier.

49. Diamond Rubber now no longer uses Premier for its projects.

50. Additionally, IB&M and Isbell utilized Isbell's relationships developed with customers as an employee of Premier, as well as the misappropriated Trade Secrets to poach the following customers of Premier: Diamond Rubber, Montgomery Wastewater, Birmingham Hide & Tallow, Precoat Metals, T&M Rentals, Foster Farms, Homeland Vinyl, Hill Hospital, Koppers, Millennium Tires, NTN Bower, Southfresh Feeds, and Von Braun.

51. In a further effort to cripple Premier's Birmingham operations, Isbell and IB&M also solicited Premier employees to leave employment to join Isbell at IB&M, including Jonathan Edmondson, Bailey Broadhead, Scott Brown, Andrew Philips, and Patrick Green.

52. Premier has made another demand on Isbell to return the Trade Secrets and to cease and desist from continuing to utilize the Trade Secrets, but Isbell has failed to take any action in response to that demand.

53. Further, Premier has made demand on IB&M to cease utilizing the Trade Secrets, and IB&M, through counsel, claimed it had directed Isbell not to utilize the Trade Secrets, yet IB&M has failed to offer any assurances that it had in fact not utilized the Trade Secrets.

## COUNT I
## VIOLATION OF ALABAMA TRADE SECRETS ACT,
## ALA. CODE § 8-27-1, ET SEQ.
## (AGAINST ALL DEFENDANTS)

54. Premier repeats the allegations set forth in paragraphs 1–27, 33–38, 41, and 50–53.

55. The Trade Secrets, as defined supra ¶ 11, constitute Trade Secrets under Ala. Code § 8-27-2(1).

56. Isbell discovered the Trade Secrets by improper means, including theft, misrepresentation, trespass, and other deliberate acts taken for the specific purpose of gaining access to the Trade Secrets by means such as electronic, photographic, telescopic, or other aids to enhance normal human perception where Premier reasonably should be able to expect privacy.

57. Isbell's disclosure and use of the Trade Secrets constitutes a breach of confidence in Isbell by Premier.

58. IB&M learned the Trade Secrets from Isbell, and IB&M knew or should have known that the Trade Secrets were Trade Secrets and that Isbell had discovered them by improper means or that Isbell's disclosure or use constitutes a breach of confidence reposed in Isbell by Premier.

59. Defendants' violations of the Trade Secrets Act entitle Premier to seek:

   a.   Injunctive or other equitable relief;

      b.      The recovery of any profits or benefits Defendants received that are attributable to the misappropriation; and

      c.      Premier's actual damages.

60.    Premier is also entitled to its attorney's fees incurred as well as exemplary damages in an amount at least equal to Premier's damages.

61.    Defendants' misappropriation and use of the Trade Secrets also allowed Defendants to poach the following existing customers of Premier: Diamond Rubber, Montgomery Wastewater, Birmingham Hide & Tallow, Precoat Metals, T&M Rentals, Foster Farms, Homeland Vinyl, Hill Hospital, Koppers, Millennium Tires, NTN Bower, Southfresh Feeds, and Von Braun.

62.    Defendants' misappropriation of the Trade Secrets has damaged Premier in an amount to be shown at trial.

## COUNT II
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS
## (AGAINST ISBELL)

63.    Premier repeats the allegations set forth in paragraphs 1–2, 4–10, and 28–32.

64.    Premier had a business relationship with Russell Medical Center, Harmony Elementary, and Grayson Lumber, and Isbell was aware of those business relationships.

65. Isbell intentionally interfered with Premier's business relationships by deliberately underbidding projects for Russell Medical Center, Harmony Elementary, and Grayson Lumber.

66. Premier was damaged by Isbell's deliberate underquoting of jobs at Russell Medical Center, Harmony Elementary, and Grayson Lumber.

67. Isbell's actions were unjustifiable, and Isbell acted maliciously.

68. Isbell acted outside the course and scope of his employment relationship with Premier by deliberately underbidding projects for Premier prior to his departure.

69. Isbell's intentional interference with business relations has damaged Premier in an amount to be proven at trial.

## COUNT III
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS
## (AGAINST IB&M)

70. Premier repeats the allegations set forth in paragraphs 1, 3–10, and 42–49.

71. Premier had an existing business relationship with Diamond Rubber, and IB&M was aware of that business relationship.

72. IB&M was a stranger to that business relationship because it lacked any beneficial or economic interest, or control over, the business relationship.

73. IB&M intentionally interfered with that existing business relationship by stealing the retube project at Diamond Rubber and convincing Diamond Rubber to cease its business relationships with Premier and switch to IB&M.

74. Ultimately, IB&M was successful in poaching Diamond Rubber.

75. IB&M's actions were unjustifiable.

76. IB&M's intentional interference with business relations has damaged Premier in an amount to be proven at trial.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
## (AGAINST ISBELL)

77. Premier repeats the allegations set forth in paragraphs 1–2, 4–10, and 28–32, and 39–40.

78. As regional sales manager, Isbell owed Premier a fiduciary duty of loyalty.

79. In this fiduciary relationship, Isbell was required to act solely for the benefit of Premier in matters within the scope of his employment, and he was prohibited from engaging in conduct that was averse to his employer's interests.

80. Isbell breached his fiduciary duties of good faith and loyalty by deliberately underbidding the Russell Medical Center, Grayson Lumber, and Harmony Elementary jobs.

81. Isbell's breaches of his fiduciary duty of loyalty have damaged Premier in an amount to be proven at trial.

## COUNT V
## CONVERSION OF PERSONAL PROPERTY
## (ALL DEFENDANTS)

82. Premier repeats the allegations set forth in paragraphs 1–7 and 39–40.

83. Premier purchased certain tools that were stored in certain individual's Premier-assigned vehicles.

84. After Isbell left his employment, he took or otherwise directed others to take those certain tools stored in certain individual's Premier-assigned vehicles.

85. By taking or otherwise directing others to take the tools without compensating Premier for them, Isbell engaged in a wrongful taking, an illegal assumption of ownership, a wrongful detention, or otherwise interfered with Premier's property.

86. Further, as Isbell, Jonathan Edmondson, and Andrew Philips are now IB&M employees, they have, on information and belief, used those certain tools for the benefit of IB&M, and accordingly, IB&M has engaged in a wrongful taking, an illegal assumption of ownership, a wrongful detention, or otherwise interfered with Premier's property.

87. Defendants' conversion has damaged Premier in an amount to be proven at trial.

**WHEREFORE**, Premier prays as follows:

A. That process issue and a copy of this Second Amended Complaint be served upon Defendants, requiring them to answer within the time set forth by the Alabama Rules of Civil Procedure;

B. That at the trial of this cause, judgment be entered in favor of Premier and against Defendants in an amount to be determined at trial, but in no event less than $75,000.00, exclusive of interest and costs, as a result of Defendants' violation of the Alabama Trade Secrets Act, that the Court order Defendants to disgorge their profits or benefits attributable to the misappropriation, that the Court award injunctive or equitable relief as appropriate, and that the Court award Premier exemplary damages in an amount at least equal to Premier's damages;

C. That at the trial of this cause, judgment be entered in favor of Premier and against Isbell in an amount to be determined at trial, but in no event less than $75,000.00, exclusive of interest and costs, as a result of Isbell's interference with Premier's business relations;

D. That at the trial of this cause, judgment be entered in favor of Premier and against IB&M in an amount to be determined at trial, but in no event less than $75,000.00, exclusive of interest and costs, as a result of IB&M's interference with Premier's business relations;

E.     That at the trial of this cause, judgment be entered in favor of Premier and against Isbell in an amount to be determined at trial, but in no event less than $75,000.00, exclusive of interest and costs, as a result of Isbell's breach of fiduciary duty;

F.     That at the trial of this cause, judgment be entered in favor of Premier and against Defendants in an amount to be determined at trial, but in no event less than $75,000.00, exclusive of interest and costs, as a result of Defendants' conversion of Premier's personal property;

G.     That Premier be awarded its attorney's fees and costs from Defendants, including discretionary costs, in accordance with the Alabama Trade Secrets Act or other applicable law;

H.     That Premier be awarded prejudgment interest;

I.     Premier demands a jury to try all issues;

J.     That costs of this cause be taxed to Defendants; and

K.     That Premier be awarded such other, further, compensatory, incidental, special, and general damages to which it may be entitled.

| CHARTWELL LAW | CHARTWELL LAW |
|---|---|
| By: s/David A. Rich by ELH w/perm.<br>David A. Rich (ASB-3039-d54r)<br>drich@chartwelllaw.com<br>170 Worcester Street, Suite 200<br>Wellesley, MA 02481-5508<br>Telephone: (617) 426-2400<br>Facsimile: (617) 395-2627 | By: s/Everett L. Hixson III<br>Barret S. Albritton (*pro hac vice*)<br>balbritton@chartwelllaw.com<br>Everett L. Hixson III ((*pro hac vice*)<br>rhixson@chartwelllaw.com<br>201 W. Main St., Suite 105<br>Chattanooga, TN 37408<br>Telephone: (423) 910-2200<br>Facsimile: (423) 373-1435 |

## CERTIFICATE OF SERVICE

I certify that on January 23, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the following: Gerald R. Paulk (gpaulk@scottsboro.org) Darald Schafer (dschaffer@sampleslaw.com), H. Harold Stephens (hstephens@bradley.com), and Emily Virginia Light (glight@bradley.com).

CHARTWELL LAW

By: s/Everett L. Hixson III