FILED

2026 Jul-31  AM 09:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **PREMIER BOILER & COMBUSTION, LLC,** ) ) ) | |
| **Plaintiff/Counter-Defendant,** ) ) | |
| **v.** ) ) | **Case No.: 2:22-cv-718-AMM** |
| **PAUL ISBELL,** ) ) | |
| **Defendant/Counter-Plaintiff,** ) ) ) | |
| ) | |
| **INDUSTRIAL BOILER & MECHANICAL, INC.,** ) ) ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPNINION</u>

After a week-long trial, a jury returned a defense verdict and found that plaintiff Premier Boiler and Combustion, LLC sued defendants Paul Isbell and Industrial Boiler & Mechanical, Inc. ("IB&M") in bad faith. This case comes before the court on post-trial motions, Docs. 223, 224, 227, 228, and a motion for sanctions filed by IB&M, Doc. 193. Mr. Isbell filed a Motion to Alter or Amend the Final Judgment, Doc. 214, and a Motion to Award Attorney's Fees and Costs, Doc. 223. IB&M also filed a Motion to Award Attorney's Fees and Costs. Doc. 224. Premier Boiler filed a Renewed Motion for Judgment as a Matter of Law and Motion for

New Trial. Doc. 227. Premier Boiler also filed a Motion for Sanctions. Doc. 228. The motions are fully briefed. Docs. 229, 233–38, 241–44.

For the reasons explained below, IB&M's motion for sanctions is **DENIED** and its motion for fees and costs is **GRANTED IN PART** and **DENIED IN PART**. Mr. Isbell's motion to award fees and costs is also **GRANTED IN PART** and **DENIED IN PART**. Mr. Isbell's motion to alter or amend the final judgment is **GRANTED**. Premier Boiler's renewed motion for judgment as a matter of law and motion for new trial is **DENIED**. Premier Boiler's motion for sanctions is also **DENIED**.

## I.    BACKGROUND

This dispute arises from an employment relationship between Premier Boiler and Mr. Isbell. *See* Doc. 31. After the employment relationship ended, Premier Boiler brought this suit against Mr. Isbell and his new employer, IB&M, alleging violation of the Alabama Trade Secrets Act ("ATSA"), intentional interference with business relations, breach of fiduciary duty, and conversion of personal property. *Id.* at 11–15. Mr. Isbell brought two counterclaims: one alleging violation of the Alabama Sales Representative's Commission Contracts Act for failure to pay commissions owed and one alleging breach of contract for failing to pay Mr. Isbell

2

certain health insurance premiums. Doc. 33 at 15.

Premier Boiler alleged that "Isbell acted as Premier's face in Birmingham, where he had access to all Premier's Trade Secrets, including its financial data, daily job cost reports, invoices, and . . . each Birmingham Premier employee's salary." Doc. 31 ¶ 23. Premier Boiler alleged that its trade secrets also include "Premier's marketing strategies and plans, distribution plans, business strategies and plans, job cost data, pricing margins, financial records, customer lists, customer contact information, vendor information, purchase orders, customer sales records, product development records, employee salary numbers, and profit margins." *Id.* ¶ 11.

While working for Premier Boiler, "Isbell began negotiating a new position with Premier's direct competitor, IB&M." *Id.* ¶ 24. According to Premier Boiler, while working as a Premier Boiler employee, Mr. Isbell misappropriated "for his own benefit, including for use at IB&M" Premier Boiler's trade secrets. *Id.* ¶ 26. Premier Boiler maintained that "Isbell and IB&M have been utilizing the Trade Secrets to solicit customers of Premier to utilize IB&M's services" and "IB&M has in at least once instance stolen a job from Premier." *Id.* ¶¶ 41–42. Premier Boiler further alleged that Mr. Isbell "had taken over $1,600.00 worth of power tools stored in trucks utilized by Premier." *Id.* ¶ 39. Finally, Premier Boiler claimed that Mr.

3

Isbell "deliberately underbid[] projects for" several Premier Boiler customers. *Id.* ¶ 65.

Mr. Isbell alleged in his counterclaim that Premier Boiler agreed to pay Mr. Isbell a 5% commission "on all the sales resulting from his efforts and services and sales representative services." Doc. 33 at 13. Mr. Isbell claimed that "Premier has failed or refused to pay commissions which are properly due and owing to Isbell." *Id.* at 14. And in his second counterclaim, Mr. Isbell alleged that "Premier agreed, as a condition of Isbell's employment with Premier, to pay to Isbell the excess amount of his health insurance premiums over and above the amount of health insurance premiums Isbell paid at his previous employer," but "Premier has failed or refused to pay such premiums." *Id.* at 15.

On March 21, 2023, the court issued its first scheduling order utilizing the parties' proposed dates, with the trial ready date set for June 2024. Doc. 37 at 4. The court granted seven extensions, Docs. 45, 55, 60, 64, 68, 72, and 74, "[y]et Premier Boiler let the discovery deadline pass on April 28, 2025 despite taking no depositions," Doc. 94 at 11.

The defendants filed motions for summary judgment on May 27, 2025, and the accompanying briefs on May 28, 2025. Docs. 77, 79–81. According to the initial

order governing this case, the responses to the summary judgment motions were due on June 18, 2025. *See* Doc. 34 at 16. Because the court had not received any responses as of June 20, 2025, it sent an email to counsel inquiring whether the motions for summary judgment were opposed. *See* Doc. 94 at 5 (reproducing the email and Premier Boiler's response). Counsel for Premier Boiler responded eleven minutes later, explaining that it "erroneously calendared them as due on 6/19, but due to the federal holiday, they would be due today, 6/20." *Id.* No filings were made on June 20, 2025. No filings were made on June 21, 2025. Then, at 10:25 PM[1] on June 22, 2025, Premier Boiler filed its evidentiary submission. Doc. 82. Its response to Mr. Isbell's motion for summary judgment followed at 11:58 PM that same night. Doc. 83. And a few hours later, at 7:36 AM on June 23, 2025, Premier Boiler filed its response to IB&M's motion for summary judgment. Doc. 84. Two days later, on June 25, 2025, the defendants moved to strike Premier Boiler's untimely filings. Doc. 86. Later that same day, Premier Boiler moved for the court to summarily deny defendants' motions for summary judgment, reopen discovery under Federal Rule of Civil Procedure 56(d), and continue trial due to the defendants' purported "rank gamesmanship," "dilatory tactics," and "sharp practice." Doc. 87 at 1–2.

---

[1] All times noted in this order are in Central Daylight Time.

5

The court described Premier Boiler's various claims about its efforts during discovery, which the defendants categorically denied as "untrue" and produced various emails between counsel showing Mr. Isbell and IB&M's efforts (and Premier Boiler's lack thereof) during discovery. *See* Doc. 94 at 8–11. The court explained that "[t]he record demonstrates four key points." *Id.* at 11. "*First*, that Premier Boiler has no problem asking for extensions." *Id.*; *see* Docs. 39, 54, 59, 67, and 73. Indeed, the court granted **seven** extensions. Docs. 45, 55, 60, 64, 68, 72, 74. "Yet, Premier Boiler let the discovery deadline pass on April 28, 2025 despite taking no depositions." Doc. 94 at 11. "*Second*, that 'the parties [had] a good working relationship,' Doc. 59 at 2, and, as such, good faith efforts were made to set deposition dates." Doc. 94 at 12. "*Third*, that at least in this case, Premier Boiler repeatedly missed deadlines." *Id.* "Before blowing its response deadline and its new (self-imposed) response deadline, Premier Boiler apparently blew its discovery deadline." *Id.* And Premier Boiler's claims about the defendants' behavior "ring hollow upon the court's careful review of the parties' communications and the overall record in this case." *Id.* And "*[f]ourth*, Premier Boiler failed to take advantage of discovery despite being given the opportunity to do so." *Id.*

The court granted Premier Boiler's motion for the court to accept its out-of-

6

time filings, but denied the motion to reopen discovery, summarily deny the motions for summary judgment, and continue trial. *Id.* at 13–14. The court reminded Premier Boiler that "[d]eadlines are not meant to be aspirational; counsel must not treat the goodwill of the court as a sign that, as long as counsel tries to act, he has carte blanche permission to perform when he desires." *Id.* at 12 (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004)).

The court granted summary judgment in favor of defendants on only Premier Boiler's conversion claim related to the allegedly stolen tools. Doc. 107 at 17.

On September 8, 2025, the day trial was set to begin, the parties informed the court that certain documents had been disclosed in violation of the standing protective order—Mr. Isbell had received from his counsel access to certain documents labeled as "Attorney's Eyes Only." *See* Doc. 152 at 2–3. After a lengthy discussion with the parties in open court, the court granted a "modest continuance to allow . . . all parties to fully investigate what occurred and what its meaning for trial might be." *Id.* at 27. The court specifically stated that it did not intend to reopen all discovery, but did "intend to allow limited discovery solely on the issue of the relevance of – facts related to and the relevance of the breach of the protective order." *Id.* at 29. The court gave the parties thirty days to conduct this limited

7

discovery. *Id.* at 30.

After the thirty-day deadline for discovery passed, IB&M filed a motion to compel Premier Boiler to respond to IB&M's interrogatories and requests for production of documents. Doc. 164. After reviewing Premier Boiler's obfuscatory "answers" to IB&M's requests, the court granted IB&M's motion to compel and ordered Premier Boiler to substantively answer the requests within seven days. Doc. 172 at 10. The court detailed its concern about Premier Boiler's contumacious conduct throughout the litigation and warned Premier Boiler that the court would not tolerate further refusal to answer. *See* Doc. 172.

Three days after the court issued its stern warning—and a mere two weeks before trial—Premier Boiler filed a motion to recuse. Doc. 173. Premier Boiler argued for the first time—more than three years after it filed this lawsuit, more than five years since the undersigned practiced law as an attorney, more than a decade since the collaboration that Premier Boiler referenced, and on the eve of trial—that the undersigned's previous professional affiliation with one of the lawyers for Mr. Isbell created an appearance of impropriety. *See* Docs. 173, 174. The court explained that "Premier Boiler cites no legal authority—binding or otherwise—that even supports, let alone requires, recusal here." Doc. 191 at 6. "Further, the record in this

8

case refutes any allegation of even an appearance of partiality to the defendants." *Id.* at 8. The court reminded Premier Boiler that "it has been exceedingly generous to Premier Boiler and has 'granted an unusual number of extensions' in this case." *Id.* at 8–9. The court emphasized that in total, it had granted **eight** extensions, but each time, "Premier Boiler let the entire discovery period pass without taking any depositions." *Id.* at 9. "And when Premier Boiler told the court after the extended discovery period that it needed more time to prepare for trial, Premier Boiler lamented the allegedly too-short timeframe, but never even actually moved for a **ninth** extension of time or for a continuance of the trial." *Id.*

The court explained that Premier Boiler "filed a recusal motion on the basis of publicly available information and with no legal basis." *Id.* The court explained that this tactic "was of a piece" with Premier Boiler's "other troubling pretrial conduct." *Id.* at 9–10. "Premier Boiler did not raise concerns about the undersigned's impartiality until two weeks before trial and three days after the court issued a ruling condemning Premier Boiler's obstreperous conduct, despite the Bradley firm's appearance in the case [several] years ago and Mr. Smith's appearance in the case nearly four months [before]." *Id.* at 11. And though Premier Boiler claimed that it had "only recently" discovered the information, Doc. 173 at 4, "each exhibit that

9

Premier Boiler relie[d] upon is a public document," Doc. 191 at 11.

Premier Boiler complained that the undersigned did not disclose "information about a years-old professional collaboration between counsel and the undersigned." *Id.* at 12. "But Premier Boiler cite[d] no authority that requires judicial disclosure of any publicly available information, let alone such information . . . ." *Id.* So, the court explained, "Premier Boiler's unsupported complaints about nondisclosure appear as efforts to avoid accountability for its own untimeliness—conduct that is all too familiar throughout Premier Boiler's pretrial behavior." *Id.*

"Ultimately, Premier Boiler's recusal motion [was] meritless, refuted by the record, and 'untimely, based upon information readily available to [it] prior to trial.'" *Id.* at 12–13 (quoting *United States v. Siegelman*, 640 F.3d 1159, 1188 (11th Cir. 2011)). "Further, it 'ha[d] all the earmarks of an eleventh-hour ploy based upon [its] dissatisfaction' with the undersigned's ruling on the motion to compel and repeated warnings about Premier Boiler's pretrial conduct." *Id.* at 13 (quoting *Siegelman*, 640 F.3d at 1188). So the court denied Premier Boiler's motion to recuse and explained that "Premier Boiler's pattern of pretrial conduct causes the court serious concern about how Premier Boiler and its counsel are conducting themselves. The court will not tolerate any further unsupported attempts to delay or frustrate disposition of this

10

case." *Id.*

Later that day, IB&M filed a motion for sanctions, explaining that Premier Boiler had not substantively responded to IB&M's discovery requests and instead continued its "contumacious conduct and efforts to evade compliance with this Court's order." Doc. 193 at 10. IB&M "request[ed] that the Court find Premier Boiler in contempt of court, award IB&M its reasonable attorneys' fees and costs arising from the protraction of this litigation from September 8, 2025, and impose such additional sanctions that the Court deems to be appropriate." *Id.* at 13.

The court promptly set a contempt hearing on the matter, but just before the contempt hearing was set to begin, IB&M notified the court that Premier Boiler had "provided substantive answers," so the contempt hearing was not necessary. Doc. 196 at 1. IB&M informed the court that it "d[id] not intend to waive its claim for mandatory attorney's fees and expenses . . . or such other relief . . . that the Court may deem equitable and just related to this discovery dispute." *Id.* at 1–2.

On the first day of the rescheduled jury trial, the court heard (outside the presence of the jury) the *voir dire* of Premier Boiler's expert witness on damages, Tyler Wright, to assist the court in deciding the defendants' motion to exclude Mr. Wright's testimony. Day 1 Tr. at 69–153. Mr. Wright's testimony ventured into

11

"fraught territory" regarding his methodology and calculations, Day 1 Tr. at 112, and the court explained that Mr. Wright's factual "assumptions are baked into the growth rate that he has used such that if defendants ask why the growth rate appears as it does in his calculations his answer is going to involve him reciting facts that are the jury's province to find," Day 1 Tr. at 148. So the court suggested that the parties consider bifurcating the trial. Day 1 Tr. at 148. The parties could not agree on bifurcation, and the next day the court bifurcated the trial into a liability phase and a damages phase. Day 2 Tr. at 2–3.

During the five-day jury trial, the court granted judgment as a matter of law on several claims pursuant to an agreement by the parties not to litigate those claims further: (1) Premier Boiler's claim against IB&M for intentional interference with business relations, (2) Premier Boiler's claim against Mr. Isbell for intentional interference with business relations, (3) Premier Boiler's claim against Mr. Isbell for breach of fiduciary duty, and (4) Mr. Isbell's counterclaim regarding his health insurance. Day 4 Tr. at 63–64. Accordingly, the only claims tried to the jury were Premier Boiler's claims against IB&M and Mr. Isbell for violation of the ATSA, and Mr. Isbell's breach of contract counterclaim against Premier Boiler for unpaid commissions. *See* Day 4 Tr. at 5–7, 65–66 (stipulating to the existence of a contract

12

for a 5% commission for sales), 83 (reading such stipulation to the jury). *But see* Day 1 Tr. at 5 ("[W]e have withdrawn any reliance on the commissions statute.").

At the end of the liability phase (Phase 1), the jury returned a verdict against Premier Boiler and in favor of Mr. Isbell and IB&M. *See* Doc. 211. The jury made five findings: (1) Premier Boiler did not prove the existence of a trade secret,[2] (2) Premier Boiler did not prove that Mr. Isbell misappropriated a trade secret, (3) Mr. Isbell proved that he did the things that the contract required him to do, but Premier Boiler breached or broke the contract, (4) Mr. Isbell proved that Premier Boiler's breach of contract caused him harm, and (5) Premier Boiler did not prove that IB&M misappropriated a trade secret. *See id.*

The ATSA provides, "Reasonable attorney's fees to the prevailing party if: . . . A claim of actual or threatened misappropriation is made or resisted in bad faith." Ala. Code § 8-27-4(a)(2). So after the jury determined that Mr. Isbell and IB&M had not misappropriated a trade secret, Doc. 211, the jury had to determine whether Mr. Isbell and IB&M, as the prevailing parties, were entitled to reasonable attorney's fees. During the damages phase of the trial (Phase 2), along with the damages portion

---

[2] The jury answered this question twice: once on the verdict form regarding Mr. Isbell and once on the verdict form regarding IB&M. *See* Doc. 211. Both times, the jury found that Premier Boiler did not prove the existence of a trade secret. *See id.*

13

of Mr. Isbell's claim for unpaid commissions, Mr. Isbell and IB&M tried their allegation that Premier Boiler brought its claims against them in bad faith. *See* Day 4 Tr. at 137–141.

On Day 5—the last day of the jury trial—the jury found that Premier Boiler brought its misappropriation claims in bad faith. Doc. 212 at 2. The jury awarded Mr. Isbell $45,000 in compensatory damages for his claim regarding unpaid commissions. *Id.*

Mr. Isbell filed a motion to alter or amend the final judgment "to fully recite the adjudicated claims, to award Isbell damages and interest on his counterclaim, and to tie any fee award into the final judgment." Doc. 214 at 1. Mr. Isbell also filed a Motion to Award Attorney's Fees and Costs. Doc. 223. IB&M filed a Motion to Award Attorney's Fees and Costs, Doc. 224, in addition to its pending motion for sanctions, Doc. 193. Premier Boiler filed a Renewed Motion for Judgment as a Matter of Law and Motion for New Trial. Doc. 227. Premier Boiler also filed a Motion for Sanctions relating to the protective order breach. Doc. 228.

## II.    LEGAL STANDARD

### A. Rule 50(b) Standard

Under Federal Rule of Civil Procedure 50, judgment as a matter of law is

14

appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving party.]" Fed. R. Civ. P. 50(a)(1). Under controlling precedent, "[j]udgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310 (11th Cir. 2019) (cleaned up). "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (cleaned up).

"[T]he jury's particular findings are not germane to [this] legal analysis." *Chaney v. City of Orlando*, 483 F.3d 1221, 1228 (11th Cir. 2007). That is, "[o]nly the sufficiency of the evidence matters; what the jury actually found is irrelevant." *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012).

The court must "review all of the evidence in the record," and "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court "must disregard all evidence

15

favorable to the moving party that the jury is not required to believe." *Id.* at 151. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (quoting *Portion of Evidence Considered*, 9B Fed. Prac. & Proc. Civ. § 2529 (3d ed.)). Testimony is only "incredible as a matter of law" if "it relates to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (cleaned up).

Because a Rule 50(b) motion is a renewed motion for judgment as a matter of law, the court may grant the motion "only on grounds advanced in the preverdict Rule 50(a) motion." *McGinnis v. Am. Home Mort. Servicing, Inc.*, 817 F.3d 1241, 1260 (11th Cir. 2016) (cleaned up). "[B]ecause the rule is a harsh one, [the court] . . . take[s] a liberal view of what constitutes a motion for directed verdict." *Id.* at 1261 (cleaned up). The court may grant a Rule 50(b) motion on grounds that are "closely related" to those argued under Rule 50(a), such that setting aside a jury's verdict would not come as a surprise to the non-movant. *Id.*

Further, the court "does not have the authority under Rule 50(b) to rule *sua*

16

*sponte* on issues not raised by the parties." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004); *see also Crawford v. Andrew Sys., Inc.*, 39 F.3d 1151, 1154 (11th Cir. 1994) ("Just as we would not permit defendants who had made no previous motion to ask the court to rule on the legal sufficiency of the evidence once a verdict had been returned against them, we cannot permit the district court to so rule *sua sponte*.").

### B.  Rule 59 Standard

The court may grant a motion for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure "when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (cleaned up). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (cleaned up).

"Motions for new trial on the basis of erroneous and prejudicial jury instructions are within the district court's discretion . . . ." *Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018). New trials should be granted "[i]f the

17

instructions do not accurately reflect the law and do not correctly instruct the jury so that [the court] [is] left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* (cleaned up); *see also Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013) ("In refusing to give a requested jury instruction, an abuse of discretion is committed only when (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." (cleaned up)).

Rule 59(e), on the other hand, permits the court to alter or amend a judgment. "The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (cleaned up). "A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Id.* (cleaned up). But "a postjudgment motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under Rule 59(e)." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989).

## C. Rule 37 Standard

Federal Rule of Civil Procedure 37 provides for remedies when a party fails

18

to properly participate in discovery. *See* Fed. R. Civ. P. 37. The rule mandates certain remedies when a motion to compel "is granted—or . . . the disclosure or requested discovery is provided after the motion was filed." Fed. R. Civ. P. 37(a)(5)(A). "[T]he court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). Similarly, the rule provides for remedies when "a party . . . fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Along with the "further just orders" that the court may issue, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

### D. Attorney's Fees Standard

"It is beyond dispute that in this diversity action, the substantive law to be applied is the . . . law of [Alabama], while federal law governs the procedure." *See Columbus Mills, Inc. v. Freeland*, 918 F.2d 1575, 1577 (11th Cir. 1990). "Thus, [Alabama] law controls both the questions of the availability of attorneys' fees and

the standards to determine when the attorneys' fees should be awarded." *Id.*

Attorney's fee awards in Alabama are governed by the reasonableness standard in

*Peebles v. Miley*, 439 So. 2d 137 (Ala. 1983). *Van Schaack v. AmSouth Bank, N.A.*,

530 So. 2d 740, 749 (Ala. 1988).

*Peebles* "added five more criteria to the seven that had been enumerated in

[Alabama] cases." *Id.* There are twelve criteria:

> (1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.

*Id.* "These criteria are for purposes of evaluating whether an attorney fee is

reasonable; they are not an exhaustive list of specific criteria that must all be met."

*Ex parte Shinaberry*, 326 So. 3d 1037, 1040 (Ala. 2020).

"Of course, not all of the criteria will be applicable." *Van Schaack*, 530 So.

2d at 749. "Indeed, there would hardly ever be a case where the determination of

attorney's fees brought into play every criterion." *Id.* (cleaned up). But "a trial

court's order awarding attorney fees should show that it considered all 12 *Peebles* factors, even if it summarily concludes that not all the factors are implicated." *CBS Holdings, LLC v. Hexagon US Fed., Inc.*, __ So. 3d __, No. SC-2024-0308, 2025 WL 1910167, at *7 (Ala. July 11, 2025) (emphasis omitted).

"In order for a trial court to satisfy its [*Peebles*] obligation . . . , a party requesting attorney fees must first provide sufficient evidence to support its request." *Id.* at *8. "Because it is generally recognized that the first yardstick that is used by the trial judges in evaluating a request for attorney fees is the time consumed . . . , a petitioner must include some accounting of the time consumed on the matter with an application for attorney fees." *Id.* (cleaned up). "Applications based upon time consumed should sufficiently describe the billed time such that the trial court can independently calculate what would be an appropriate fee." *Id.* "Under this method, the petitioner must demonstrate that the time billed and the billing rate were reasonable and that the work was necessary . . . , so that the trial court can then use that information to make its own determination of what an appropriate attorney-fee award should be." *Id.* (cleaned up). "How detailed this description must be will depend on the particular facts of each case." *Id.* "Ultimately, the descriptions should be detailed enough so that the trial court can check for itself that the requested

21

attorney fees include only charges for time consumed for which the petitioner is entitled to recover." *Id.*

### E. Rule 54(d) Standard

"Under Rule 54(d), the prevailing party automatically is entitled to costs unless the court otherwise directs." *Buchanan v. Stanships, Inc.*, 485 U.S. 265, 268 (1988) (cleaned up). Rule 54(d) provides that "[u]nless a federal statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "To be a prevailing party[,] a party need not prevail on all issues to justify a full award of costs, however. Usually the litigant in whose favor judgment is rendered is the prevailing party for purposes of rule 54(d)." *Head v. Medford*, 62 F.3d 351, 354 (11th Cir. 1995) (cleaned up).

### F. Sanctions Standard

Federal Rule of Civil Procedure 37(b)(2)(A), (C) provides:

> If a party . . . fails to obey an order to provide or permit discovery, . . . the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

The Eleventh Circuit has held that "a Rule 26(c) protective order is not an order to

22

provide or permit discovery, and therefore, such orders do not fall within the scope of Rule 37(b)(2)." *See Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1323 (11th Cir. 2001) (cleaned up) (reversing an award of attorney's fees for breach of a protective order on the basis of Rule 37).

But under the court's inherent authority, the court may "sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees." *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103–04 (2017). "[S]uch an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Id.* But "[a] district court has broad discretion to calculate fee awards under that standard." *Id.* at 104.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. The Supreme Court has held that even "particularly severe sanction[s]" are "within the court's discretion." *Id.* at 45.

A finding of subjective bad faith or something tantamount to it is necessary to

support a sanction issued pursuant to a court's inherent power. *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir. 1997)); *accord Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002). "If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." *Barnes*, 158 F.3d at 1214. "[I]n the absence of direct evidence of subjective bad faith, [the bad-faith] standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1224–25; *accord Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) (stating that inherent powers require a finding that "counsel's conduct . . . constituted or was tantamount to bad faith"). "This is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith." *Purchasing Power*, 851 F.3d at 1225 (citing *Barnes*, 158 F.3d at 1214).

24

## III.   ANALYSIS

### A. Mr. Isbell's Motion to Alter or Amend the Final Judgment

#### 1.  Adjudicating All Claims

Mr. Isbell moved the court to, among other things, "enter an amended final judgment specifying adjudication of all claims listed in the pretrial order." Doc. 214 ¶ 2. Premier Boiler responded that "it only opposes Isbell's requested relief to the extent that it seeks to include an award of prejudgment interest." Doc. 229 ¶ 1. Accordingly, the court **GRANTS** Mr. Isbell's motion to the extent that the court will amend the final judgment to specify adjudication of the claims listed in the pretrial order by adding the following:

> As to Premier Boiler's conversion claim, the court granted summary judgment in favor of Mr. Isbell and IB&M, Doc. 107 at 17.
>
> The court granted judgment as a matter of law on several claims during the trial pursuant to an undisputed agreement by the parties not to litigate those claims further: (1) Premier Boiler's claim against IB&M for intentional interference with business relations, (2) Premier Boiler's claim against Mr. Isbell for intentional interference with business relations, (3) Premier Boiler's claim against Mr. Isbell for breach of fiduciary duty, and (4) Mr. Isbell's counterclaim regarding his health insurance. Day 4 Tr. at 63–64.
>
> As the verdict forms reflect, the jury returned a verdict in

25

favor of Mr. Isbell and IB&M on: (1) Premier Boiler's trade secret claim against Mr. Isbell, (2) Premier Boiler's trade secret claim against IB&M, and (3) Mr. Isbell's breach of contract counterclaim for nonpayment of commissions. Doc. 211.

### 2. Prejudgment Interest

Premier Boiler "opposes Isbell's requested relief to the extent that it seeks to include an award of prejudgment interest" along with Mr. Isbell's $45,000 compensatory damages award. Doc. 229 ¶ 1; *see* Doc. 212 at 2. Premier Boiler says that Mr. Isbell is not entitled to prejudgment interest for two reasons: (1) he "waived his request for prejudgment interest by not pleading it or otherwise including it in his pretrial order" and (2) "the jury's award was not an amount certain, as required under Ala Code § 8-8-8." *Id.* ¶ 2. Both of these arguments are unavailing.

### a. Waiver

According to Premier Boiler, Mr. Isbell waived his request for prejudgment interest because he "did not request an award of prejudgment interest in his counter-claim" and "did not list prejudgment interest in any fashion in the pretrial order, which supplants the pleadings." Doc. 229 ¶ 4.

*First*, Mr. Isbell did request an award of prejudgment interest in his counterclaim. *See* Doc. 33 at 16. Mr. Isbell's counterclaim requested "[t]hat the

26

Court award interest and costs and grant such other and further relief to which Isbell may be entitled." *Id.* So it is false that "Isbell sought an award of prejudgment interest for the first time at trial." Doc. 229 ¶ 4. It is similarly false that "Isbell failed to make a proper and timely demand for prejudgment interest, instead making its demand on the final day of trial." Doc. 216 at 2.

*Second*, the lack of the word "interest" in the pretrial order does not foreclose Mr. Isbell's entitlement to prejudgment interest. "[T]here is now ample authority that prejudgment interest is not an added remedy, but simply is part of providing full compensation to the injured party." *Kansas v. Colorado*, No. 105, ORIGINAL, 2000 WL 34508307, at *40 (U.S. Aug. 31, 2000) (collecting cases). The Supreme Court has "repeatedly stated that prejudgment interest is an element of [a party's] complete compensation." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (cleaned up). "Thus, unlike attorney's fees, . . . prejudgment interest traditionally has been considered part of the compensation due plaintiff." *Id.*; *see also City of Milwaukee v. Cement Div., Nat'l Gypsum, Co.*, 515 U.S. 189, 197 (1995) ("[P]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation.").

"[P]rejudgment interest, like all monetary interest, is simply compensation for the use or forbearance of money owed." *Transmatic, Inc. v. Gulton Indus., Inc.*, 180

27

F.3d 1343, 1347 (Fed. Cir. 1999). "Money today is not a full substitute for the same sum that should have been paid years ago." *Kansas*, 2000 WL 34508307, at *41 (cleaned up). So "the only way the wronged party can be made whole is to award him interest from the time he should have received the money. At the conclusion of the dispute, the parties should be in the same position regardless of whether . . . [a party] is forced to sue . . . ." *Louisiana & Arkansas Ry. Co. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir. 1966).[3] And to accomplish that, "[p]rejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n. 2 (1987).

Further, Federal Rule of Civil Procedure 54(c) instructs that "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see also Judgments in Nondefault Cases*, 10 Fed. Prac. & Proc. Civ. § 2664 (4th ed.) ("Under Rule 54(c) courts should feel free to award prejudgment interest regardless of the

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

28

absence of any request in the demand if it otherwise is appropriate to do so."). So although "a pretrial order supersedes the pleadings," thereby "eliminating" any claims not preserved in the pretrial order, *State Treasurer of Mich. v. Barry*, 168 F.3d 8, 9–10 (11th Cir. 1999), Mr. Isbell's entitlement to prejudgment interest as a remedy is an implicit part of the compensatory damages he sought, not a freestanding "claim" to be pleaded (or lost).

Additionally, in federal diversity actions, prejudgment interest is governed by state law, *see Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1066 (11th Cir. 1996), and under Alabama law "[o]nce [the party's] damages are fixed, the trial judge or the clerk should make the mathematical calculation necessary to determine the interest to which the statute entitled him." *Maddox v. Alfa Mut. Ins. Co.*, 577 So. 2d 457, 459 (Ala. 1991); *see also Stoudenmeier v. Williamson*, 29 Ala. 558, 569 (1857) ("[I]n this State, whenever one party has a legal right to recover of another a debt or damages as due at a particular time, he is also entitled to interest as an incident, from the maturity of the demand until the trial, unless some rule of law declare otherwise."). Accordingly, Mr. Isbell did not waive any entitlement to prejudgment interest.

### b.  Sum Certain or Capable of Being Made Certain

29

Premier Boiler next argues that Mr. Isbell's damages are not subject to the prejudgment interest requirement of Alabama Code § 8-8-8 because "the jury's damages award was not an amount certain." Doc. 229 ¶ 3. Premier Boiler believes it was not an amount certain because "the amount of damages was not fixed until the jury rendered its decision" and "the amount awarded was less than what Isbell sought." *Id.* ¶ 5. Alabama law does not mandate Premier Boiler's position.

Alabama law states that "[a]ll contracts, express or implied, for the payment of money . . . bear interest from the day such money, . . . estimating it at its money value, should have been paid." Ala. Code § 8-8-8. "This statute has been interpreted to mean that in contract cases, where an amount is certain or can be made certain as to damages at the time of breach, the amount may be increased by the addition of legal interest from that time until recovery." *Maddox*, 577 So. 2d at 458 (cleaned up). In other words, Alabama law allows for an award of prejudgment interest on damages that are liquidated. *See Miller and Co. v. McCown*, 531 So. 2d 888, 889 (Ala. 1988). Liquidated damages are those that are "reasonably ascertainable at time of breach, measured by fixed or established external standard, or by standard apparent from documents upon which plaintiffs based their claims." *U.S. Fid. and Guar. Co. v. German Auto, Inc.*, 591 So. 2d 841, 843 (Ala. 1991) (quoting Black's

30

Law Dictionary 391 (6th ed. 1990)).

Premier Boiler claims that "[u]nder Alabama law, where the sum certain does not present itself until after the jury deliberates, there can be no award of prejudgment interest." Doc. 229 ¶ 5. In one of the cases Premier Boiler cites for this proposition, the court disallowed prejudgment interest because the jury rendered a general verdict that did not indicate whether it was finding an express contract or an implied contract. *See Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 448 (Ala. 1996). The parties presented evidence of both an express contract and, in the alternative, an implied contract, and "[t]he jury reasonably could have found that while [the plaintiff] did not perform whatever actions were necessary to accept [the defendant's] unilateral offer and create an express contract, the parties did form an implied contract." *Id.* at 447. But under an implied contract theory, the amount owed would have been "reasonable compensation" so, "because the jury's general verdict may have been rendered on the implied contract claim, on which the amount of . . . damages would not have been a sum certain until determined by the jury, prejudgment interest may not be awarded." *Id.* at 448. The court did not say the same about the express contract theory. *See id.*

Alabama courts have held that even if the damages are not settled until a jury

31

determines the underlying facts, prejudgment interest is still available where "the compensatory loss could be fixed by a simple mathematical computation." *Lapeyrouse Grain Corp. v. Tallant*, 439 So. 2d 105, 112 (Ala. 1983); *see, e.g.*, *Miller & Co.*, 531 So. 2d at 888–89 (allowing prejudgment interest where the jury had to determine how much timber had been cut so that the court could apply "a simple mathematical computation by reference to the liquidated damages provisions of the contract," which provided for certain dollar amounts per unit of timber cut); *Ballard v. Lee A. McWilliams Constr., Inc.*, 258 So. 3d 336, 339–40 (Ala. Civ. App. 2018) (allowing prejudgment interest where the parties had an agreement to pay the construction costs plus 18%, even though "the damages that the company had requested changed during the litigation as a result of the discovery of certain mathematical errors and other mistakes on the invoices and . . . [the defendant] contested certain charges on the invoices"). *But see Richards v. Gen. Motors Corp.*, 461 So. 2d 825, 827 (Ala. Civ. App. 1984) (denying prejudgment interest where the jury had to determine the value of the use of a truck to a plaintiff seeking recission of his purchase of the truck).

"[T]hree general rules have been laid out for determining the allowance of interest in Alabama: (1) The amount due must be certain; (2) the time when it is due

32

must be certain; (3) the amount due and time of payment must be known to the debtor." *Jernigan v. Happoldt*, 978 So. 2d 764, 767 (Ala. Civ. App. 2007) (cleaned up). "The fact that the parties disagree regarding the amount of damages actually due under the contract does not make those damages incapable of being ascertained for purposes of awarding prejudgment interest." *Ballard*, 258 So. 3d at 339 (analyzing Alabama Supreme Court precedent). And these three principles are satisfied when the parties agree to a mathematical formula for payment and the debtor has all the documentation needed to calculate the owed amount. *See Jernigan*, 978 So. 2d at 768 (holding that "each of the prerequisites for awarding prejudgment interest" was present where the debtor agreed to pay the plaintiff's bills plus 10% so when the plaintiff gave the debtor his bills, "the [debtor] could have determined that [the plaintiff] would have been damaged in the precise amount of those invoices plus 10% by a failure or refusal to pay").

Each of the prerequisites for awarding prejudgment interest is met here. Mr. Isbell was to be paid 5% of Premier Boiler's profit on jobs that he worked for Premier Boiler. *See* Day 4 Tr. at 5–7, 65–66 (stipulating to the existence of a contract for a 5% commission for sales), 83 (reading such stipulation to the jury). When Premier Boiler received payment from the respective clients and calculated the

33

profit, Premier Boiler had all it needed to know the amount due and when it was due. *See* Day 5 Tr. at 126–27 (testifying that "to the extent that Mr. Isbell is owed commissions after he left, [Premier Boiler] could take that [invoiced amount] times .23 times .05"), 126 (testifying that Mr. Isbell was entitled to his commissions "the week following the payment, [Premier Boiler] receiving the payment"). Premier Boiler cannot hide behind the disputes created by the conflicting, messy internal records it produced regarding Mr. Isbell's commissions. *See* Day 5 Tr. at 42–54. That the parties disputed the proper amount of commissions—based on the discrepancies between Premier Boiler's financial records and the spreadsheet it created to track the commissions for the litigation, *see* Day 5 Tr. at 42–54—does not preclude an award of prejudgment interest. This is not a case where the debtor, at the time of wrongdoing, is left to guess what a jury might value based on a nebulous concept such as "reasonable compensation." There was an express contract for 5% of Premier Boiler's profits on the relevant jobs. And at the time Premier Boiler received its profit on those jobs, the sum owed to Mr. Isbell was certain based on a simple mathematical formula. Accordingly, the court **GRANTS** Mr. Isbell's motion to alter or amend the judgment to include prejudgment interest.

At trial, the parties agreed that, should the court find an award of prejudgment

34

interest appropriate, the date on which prejudgment interest is to begin running is forty-five days after the date of Mr. Isbell's departure from Premier Boiler. Day 5 Tr. at 38. The parties stipulated that Mr. Isbell's departure from Premier Boiler was on February 18, 2022. Day 2 Tr. at 29. Accordingly, the court will **ENTER** judgment in favor of Mr. Isbell on his counterclaim for nonpayment of commissions in the amount of $45,000, plus 6% interest from April 4, 2022, through today's date, which amounts to $56,674.80. *See Rhoden v. Miller*, 495 So. 2d 54, 58 (Ala. 1986) ("Where no written contract controls the interest rate, as in this case, the legal rate of pre-judgment interest is six percent per annum . . . . , and . . . the legal rate of six percent interest should be allowed from the date the complaint is filed until redemption is effected." (emphasis omitted)).

### B. Premier Boiler's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial

#### 1. There was a legally sufficient basis for the jury to decide that Premier Boiler brought its trade secrets claim in bad faith.

Premier Boiler contends that "there was no evidence adduced at trial that shows Premier's trade secrets claim was brought in bad faith." Doc. 227 at 3. Premier Boiler says that the evidence at trial established several things: counsel advised Premier Boiler that this was a viable case; a forensic expert "established that the

35

departure of Paul Isbell caused significant losses"; Premier Boiler saw Mr. Isbell bring empty company folders, take pictures of paperwork he left behind, and forward himself work emails; Mr. Isbell "had reams of Premier's data on his personal devices for a period of three weeks, during which time a direct competitor also employed him"; and IB&M's owner testified that he considered a trade secret "the same evidence Premier claimed was a trade secret." *Id.* at 3–4.

But the "facts and inferences [do not] point overwhelmingly in favor of [Premier Boiler], such that reasonable people could not arrive at a contrary verdict." *See Luxottica Grp., S.p.A.*, 932 F.3d at 1310 (cleaned up). Based on the evidence presented at trial, "there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, [so] the motion must be denied." *See Christopher*, 449 F.3d at 1364 (cleaned up).

At trial, substantial evidence contradicted Premier Boiler's trade secret claim. Evidence established that after Premier Boiler hired an outside company to overhaul Premier Boiler's business model (including setting overhead, pricing, and a 23% profit margin), Premier Boiler did not have that company sign any kind of nondisclosure or confidentiality agreement. Day 2 Tr. at 188, 209–10. Nor did

Premier Boiler have its customers sign any kind of confidentiality or nondisclosure agreement. *See* Day 3 Tr. at 214. The jury was free to find that, standing alone, this evidence seriously undercut Premier Boiler's trade secret claim.

Further, Premier Boiler admitted that the companies with whom Mr. Isbell developed a professional relationship "are not and never were trade secrets of Premier." Day 2 Tr. at 215–16. Mr. Isbell explained that "95 percent of the customers [Premier Boiler] did work for were customers [Mr. Isbell] brought" with him from his previous employer. Day 3 Tr. at 32; Day 3 Tr. at 163–64. Mr. Isbell explained that there were only two "companies that [he] worked at the first time at Premier that [he] [has] since worked with at IB&M." Day 3 Tr. at 193. But the fact that those two customers worked with Premier Boiler was discernable from readily available, public information, so it required no inside knowledge from Mr. Isbell. *See* Day 3 Tr. at 194–95.

Further, and in any event, Mr. Isbell testified that he did not use Premier Boiler's pricing model, but instead used a pricing model that he honed through his years of experience in the boiler industry. Day 3 Tr. at 21; Day 3 Tr. at 190; *see also* Day 2 Tr. at 186 (the owner of Premier Boiler testifying that, "Upon investigation, it was discovered that Paul Isbell did not use Premier's pricing formula . . . ."). Mr.

Isbell repeatedly testified that no one at Premier Boiler ever instructed him on how to calculate profit margins, cost, or overhead, that Premier Boiler never showed him any pricing formula, and that his calculations and decisions were based solely on his sixteen pre-Premier Boiler years of industry experience. *See, e.g.*, Day 3 Tr. at 22–23, 160, 164, 196–98. He affirmed that he "had no knowledge whatsoever of [Premier Boiler's] overhead percentage or anything like that." Day 3 Tr. at 23. And Mr. Isbell testified that he never used Premier Boiler's alleged trade secret formula for pricing bids, either while at Premier Boiler or while at IB&M. *See* Day 3 Tr. at 198. Nor did "Premier have any policy with regard to maintaining secrecy about bid quotes." Day 3 Tr. at 182–83.

Additionally, Mr. Isbell told the jury that during his entire time at Premier Boiler, he was never shown any customer list, "marketing or business strategies or plans," or anything else identified as a trade secret, nor did he ever receive any training about Premier Boiler's trade secrets. Day 3 Tr. at 151, 155–57, 191. He also explained that Premier Boiler never told him that the pre-Premier Boiler customer contacts he brought would supposedly become Premier Boiler's trade secret. Day 3 Tr. at 155–56. In fact, he testified that if Premier Boiler had told him that, he would not have taken the job. Day 3 Tr. at 156.

38

The jury also heard Mr. Isbell explain that the emails he sent to himself were sent because he thought his email was not working, so he sent "test" emails. Day 3 Tr. at 65–68. He explained that one of the alleged "trade secrets" he emailed to himself was "not a real quote . . . because [the customer] didn't need a new valve they just needed packing." Day 3 Tr. at 67. He also explained that no company did the work shown on the quote he emailed—neither IB&M nor Premier Boiler—and he never shared the quote with IB&M. Day 3 Tr. at 204 ("And the economic value of those two pages and that quote was how much to Premier?" . . . "Zero."). And by sending that email, he "actually had the intentions of trying to save [the customer] account before [he] left Premier." Day 3 Tr. at 67, 204. And another of the documents Mr. Isbell emailed to himself is a "document available to the public on the world wide web." Day 3 Tr. at 162, 175.

Premier Boiler makes much of a window of time between when it requested Mr. Isbell wipe his phone and when Mr. Isbell actually wiped his phone, *see* Day 4 Tr. at 99–100, 126–27, but the jury was free to believe Mr. Isbell's testimony that in that window of time, he "really didn't know what to do" because that was his personal phone and "[he] [didn't] think [he] had anything that was detrimental to Premier on it," but he did have personal information on those devices. Day 3 Tr. at

80, 228. And "it took a little while" because Premier Boiler requested that he wipe three of his personal devices, and it cost him around $3600, which he "paid for . . . out of [his] own pocket." Day 3 Tr. at 81, 200–02. But "there [was] [never] anything on [his] phone, [his] laptop, or [his] computer that had been marked or identified as a trade secret by Premier." Day 3 Tr. at 230. And he testified that he never used any Premier Boiler-related documents on his phone "to cause any economic harm or damage to Premier." Day 3 Tr. at 231.

The evidence also showed that Mr. Isbell worked out of his home during his time with Premier Boiler. Day 2 Tr. at 206. His "home was the only office for Premier" in Birmingham for about a year. *See* Day 3 Tr. at 145. So, with Premier Boiler's knowledge, he kept Premier Boiler files in his home. *See* Day 3 Tr. at 145. He explained that when he was on camera bringing files and folders back to the Premier Boiler officer after the employment relationship ended, he was doing so not because he improperly took the folders from Premier Boiler's office, but because those files had been at his house from the beginning. *See* Day 3 Tr. at 176, 180. And Mr. Isbell testified that he reiterated that to Matt Davies (Premier Boiler's owner) when they arranged a time to deliver the documents. *See* Day 3 Tr. at 178–79. Mr. Isbell explained that he had recently begun overhauling the filing system for Premier

40

Boiler, so the folders he returned empty had been empty for "weeks to months." Day 3 Tr. at 181–82. He told the jury that he never took any company records or customer files. *See* Day 3 Tr. at 175.

Mr. Isbell also told the jury that as a Premier Boiler employee, if he wanted to be reimbursed for sales receipts, he had to submit proof of them. Day 3 Tr. at 157–58. So on the day he returned his documents and company credit card after the employment relationship ended, *see* Day 3 Tr. at 180, 189, he took pictures of his expense receipts so he could submit them for reimbursement, as was required weekly, Day 3 Tr. at 188. He explained that he knew there was a video camera in the office, but he never took a picture of anything identified to him as a Premier Boiler trade secret. Day 3 Tr. at 186, 188. The jury watched the footage from that video camera, which showed Mr. Isbell taking photos inside Premier Boiler's office. *See* Day 3 Tr. at 186; Day 2 Tr. at 140. The jury watched as a Premier Boiler employee stood by Mr. Isbell in the video and "didn't ever stop [Mr. Isbell] and say, wait, that's a Premier trade secret, you can't take a picture of that." *See* Day 3 Tr. at 189.

And as to Premier Boiler's damages expert, the jury heard testimony that Premier Boiler hired him "well after this lawsuit was filed." Day 5 Tr. at 64.

41

In short, the jury's verdict does not "go[] against the great weight of the evidence." *See* Doc. 227 at 3. The jury was entitled to credit the evidence negating Premier Boiler's belief that it had a trade secret and that such trade secret had been misappropriated. So when asked to decide whether Premier Boiler had brought a case that was "frivolous, groundless in fact or in law, vexatious, or interposed for any improper purpose," the jury had sufficient evidence to support its answer. *See Ex parte Waterjet Sys., Inc.*, 758 So. 2d 505, 509 (Ala. 1999) (explaining that bad faith under the ATSA means that the claim "is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose" (cleaned up)).

"Faced with a record of historical facts that supports conflicting inferences, [the court] must presume that the jury resolved such conflicts in favor of [the prevailing party], and we defer to the jury's judgment as to the weight and credibility of the evidence." *See Conklin v. Schofield*, 366 F.3d 1191, 1200 (11th Cir. 2004). "[T]o the extent that the verdict rests upon the jury's evaluations of the credibility of individual witnesses, and the reasonable inferences to be drawn from that testimony, [the court] owe[s] deference to those decisions." *See United States v. Siegelman*, 640 F.3d 1159, 1165 (11th Cir. 2011). "In our system, the jury decides what the facts are, by listening to the witnesses and making judgments about whom

42

to believe. This they have done, and, though invited to do so, [the court] shall not substitute [its] judgment for theirs." *See id.* (cleaned up).

The court specifically rejects Premier Boiler's argument that "the Court's rulings throughout this litigation confirm that Premier brought its claims in good faith." Doc. 242 ¶ 8. That Premier Boiler's claims survived summary judgment when the court was required to draw all reasonable inferences in its favor does not mean that the jury was forbidden to find that the case was "frivolous, groundless in fact or in law, vexatious, or interposed for any improper purpose." Indeed, the jury was empowered to make—and apparently did make—the credibility determinations that the court was forbidden to make on summary judgment.

Premier Boiler cites a case in which the Eleventh Circuit declined to impose Rule 11 sanctions where the court denied a motion for judgment as a matter of law, explaining that "[i]mplicit in the court's denial of the Rule 11 motion was its determination at the close of all the evidence that there was sufficient evidence for a jury to consider." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1479 (11th Cir. 1992). But Premier Boiler cites no authority for its suggestion that "the factors for a bad faith trade secret claim clearly implicate Rule 11," *see* Doc. 227 at 10. The absence of authority makes sense—these are analytically distinct

43

issues. The court simply allowed the jury an opportunity to decide whether it believed Premier Boiler's evidence about its own good faith. The jury clearly did not believe that evidence. That disbelief forms the basis for its Phase 2 verdict against Premier Boiler, not Rule 11 sanctions against Premier Boiler's lawyers. And when the court denied the motions for judgment as a matter of law, such ruling did not foreclose the jury's ability to find that the case was vexatious, interposed for any improper purpose, or otherwise brought in bad faith.

Accordingly, the verdict is not against the clear weight of the evidence nor based on insufficient evidence, and Premier Boiler is not entitled to judgment as a matter of law nor a new trial on this basis.

### 2. Whether Premier Boiler brought its claim in bad faith was a question for the jury.

Premier Boiler next argues that "[t]he Court erred by sending [the bad-faith] issue to the jury for consideration because it should have decided whether the claim was brought in bad faith." Doc. 227 at 4. To support this conclusion, Premier Boiler argues two things. *First*, Premier Boiler "submits that the Alabama Supreme Court has spoken to this issue in *Waterjet* because that case concerned a request to find a claim brought in bad faith that the trial court considered." *Id.* (citing *Ex parte Waterjet Sys. Inc.*, 758 So. 2d at 508). *Second*, Premier Boiler contends "that if the

decision whether to send the issue of the relative bad faith of Premier's misappropriation claim is currently undecided under Alabama law, the majority view would be that the question is reserved for the Court." *Id.* at 9. In its reply, Premier Boiler described its "core argument: the Court did not follow binding Alabama Supreme Court precedent on whether bad faith under the ATSA is a question for the Court, not the jury." Doc. 242 at 2. And "[e]ven if the Alabama Supreme Court had not spoken directly to this issue, the Court did not engage in any meaningful *Erie* analysis to determine how Alabama's highest court would decide it." *Id.*

As an initial matter, the Alabama Supreme Court did not settle this issue in *Waterjet*. As the court repeatedly explained to the parties, "the [bad-faith] issue was postverdict in *Waterjet* because that's how the parties raised it," Day 5 Tr. at 109, but the case did not "set[] forth a rule that the issue of bad faith defaults to the Court to decide," Doc. 144 at 11; *see Waterjet*, 758 So. 2d at 509–10. Rather, "the evidence probative of bad faith was in the trial, but the issue of attorneys' fees based on an allegation of bad faith did not appear until the posttrial motions were filed." Doc. 144 at 10–11; *see Waterjet*, 758 So. 2d at 508–10. "And so at that time it was the Court[']s to resolve in connection with the posttrial motion." Doc. 144 at 11. The

procedural posture is different here. Here, the parties raised the issue of bad faith well before posttrial motions. *See, e.g.*, Doc. 133 at 18 (proposing a jury instruction on bad faith nearly two months before the trial).

And Premier Boiler's characterization of the relationship between the ATSA and the ALAA is unavailing. Premier Boiler contends that "the Alabama Supreme Court has held that 'bad faith' under the ATSA must be analyzed in the same manner as claims under the Alabama Litigation Accountability Act, which expressly reserves such determinations for the Court." Doc. 242 at 2–3. The *Waterjet* court noted that "[n]either the Alabama Legislature nor th[e Alabama Supreme] Court has defined the term 'bad faith'" in the ATSA. *Waterjet*, 758 So. 2d at 509. But, the Alabama Legislature did define the term "without substantial justification" in the ALAA. *See id.*; Ala. Code 12-19-272(a). So, noting "the similarity in the purpose[s]" of the ATSA and the ALAA, the court held that the term "bad faith" in the ATSA "means the same" as "without substantial justification" in the ALAA. *Id.*

But nowhere did the *Waterjet* court indicate that by adopting a definition, it meant to wrest from the jury so fundamental a task as determining the motive and credibility of a party. Indeed, the question whether a party acted in bad faith is classically a question for the jury. *See, e.g.*, *Foy v. Holston*, 94 F.3d 1528, 1535 n.9

46

(11th Cir. 1996) ("We know that matters of intent are often jury questions."); *Cap. Nat'l Bank of Tampa v. Hutchinson*, 435 F.2d 46, 49 (5th Cir. 1970) ("[T]he intention of the parties, [is] a factual issue for the jury, not a legal question for the Court."); *Hartford Acc. & Indem. Co. v. Cosby*, 277 Ala. 596, 604 (1965) ("[I]t is a question for the jury from all the facts and circumstances to determine whether the failure on the part of the insurer to make settlement is an act of negligence or one of bad faith."); *Ledbetter v. Darwin Dobbs Co.*, 473 So. 2d 197, 201 (Ala. Civ. App. 1985) ("Whether a merchant acts in good faith is generally a jury question."); *Smith's Sports Cycles, Inc. v. Am. Suzuki Motor Corp.*, 82 So. 3d 682, 690 (Ala. 2011) ("Moreover, the issue whether a manufacturer acts in good faith in seeking to terminate a franchise agreement is an issue for the trier of fact.").

The Alabama legislature knew how to make an issue designated to be "determined by the court," *see* Ala. Code § 12-19-271(1), but it did not include that language in the ATSA, *see* Ala. Code § 8-27-4(a)(2). In the absence of clear direction from the Alabama Supreme Court and the Alabama legislature, the court will not invade the province of the jury and wrest so fundamental a task from the jury's hands.

Premier Boiler contends that the federal Defend Trade Secrets Act has

"virtually identical language" to the ATSA, and "[u]nder the DTSA, the question of whether a claim was made in bad faith is a question for the Court." Doc. 227 at 6; Doc. 242 at 3. But for this, Premier Boiler merely cites the statutory section that says nothing about who resolves the question of bad faith. *See* Doc. 227 at 6 (citing 18 U.S.C. § 1836(b)(3)(D)). That statute says:

> "In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may . . . if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party."

18 U.S.C. § 1836(b)(3)(D). And Premier Boiler's reply states, "Defendants do not address that the federal Defend Trade Secrets Act—with its virtually identical language to the ATSA—reserves the question of bad faith for the Court." Doc. 242 at 3. But again, Premier Boiler fails to cite any authority—binding or otherwise—that supports this proposition.

Finally, Premier Boiler cites various out-of-circuit and mostly unpublished cases for its proposition that "a request for attorney fees is an equitable request, which does not grant a Seventh Amendment right to a jury trial because it requires consideration of a party's state of mind, intent, and culpability." *See* Doc. 227 at 8.

48

Premier Boiler's references to "Florida and Georgia's respective trade secrets acts" are similarly unavailing. *See id.* at 6. These nonbinding cases are of no moment; none of them foreclose a court's submission of a bad-faith issue to the jury as the factual predicate for the attorney's fee question. *See id.* at 8.

The court saw the answer clearly at trial, and the court sees the answer clearly now. But in the event the court has misunderstood or misapplied Alabama law, and the relief sought is a bench trial for Phase 2, the result would be no different. There would be no additional body of evidence for the court to consider, after the opportunity to provide such evidence passed and Premier Boiler made no attempt to proffer such additional evidence. Accordingly, any error (if it exists) is harmless based on the evidentiary record that the parties developed.

### 3.  The court did not err in its jury instructions on bad faith.

Premier Boiler next contends that "[t]he Court's failure to charge the jury on the elements of a contention of bad faith, the burden of proof necessary to establish bad faith, as well as whose burden it was to establish bad faith resulted in a miscarriage of justice and warrant a new trial." Doc. 227 at 11. Specifically, Premier Boiler argues that "[t]he only instructions the jury received on burden of proof was that it was the party who brought the claim's burden to establish that claim." *Id.* And

49

"[t]here were no instructions specifying that if the jury finds certain things, it must then find for that party." *Id.* "Instead, the Court merely reiterated that its previous instructions carried over, but the new instructions did not tell the jury what to consider, whose burden it was, and the details necessary to establish the bad faith claim." *Id.* Further, Premier Boiler argues, "[t]here were also no definitions of what is frivolous, groundless in fact or in law, vexatious, or interposed for any improper purpose." *Id.* According to Premier Boiler, "the lack of instruction on burdens of proof and elements at this phase of trial led the jury to falsely equate a finding of no liability with a finding of bad faith, which the jury ultimately did find." *Id.* at 12.

IB&M and Mr. Isbell contend that "the Court's jury instruction [was] correct and error-free," and "[a]t no point did Premier assert or preserve an objection to the Court's instructions," so Premier Boiler waived any objection to the instructions. *See* Doc. 238 at 6; Doc. 236 ¶ 2.

On Day 5 of the trial, Premier Boiler proposed jury instructions for Phase 2. *See* Doc. 206. Premier Boiler proposed the following bad faith instruction:

> [I]f you find either or both of the Defendants did not misappropriate any trade secret, you must decide whether Premier brought its trade secrets claim in bad faith.
>
> A party acts in bad faith if its position is without substantial justification. Whether a party's position was

> without substantial justification means that the position is frivolous, groundless in fact or in law, vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation.

*Id.* at 9. Premier Boiler stated that it "maintains its objection that this issue should not be submitted to the jury." *Id.* n.1.

Later that day, the court discussed with the parties Premier Boiler's proposed instructions. *See* Day 5 Tr. at 2, 7, 29. The court informed the parties that "on the issue of the general instructions, [the court's] intention was to tell the parties that the instructions [the court] ha[d] already given them remain applicable." Day 5 Tr. at 7. The court asked, "Are y'all wanting me to repeat all of the general instructions about you may believe all or part of a witness's testimony or none of it?" Day 5 Tr. at 7. Premier Boiler responded, "I wasn't sure what Your Honor's preference would be so I just went ahead and left [those general instructions] in there." Day 5 Tr. at 7. Premier Boiler did not raise an objection to the court's proposal to inform the jury that the general instructions from Phase 1 still applied. *See* Day 5 Tr. at 7.

Then, the court proposed the following instruction on bad faith:

> Now that you have decided that neither defendant misappropriated a trade secret, you must decide whether Premier Boiler brought its trade secret claim in bad faith. A party acts in bad faith if its position is frivolous,

51

groundless in fact or in law, vexatious, or interposed for any improper purpose including without limitation to cause unnecessary delay or needless increase in the cost of litigation. The verdict form will contain a question about whether Premier Boiler acted in bad faith.

Day 5 Tr. at 30. Premier Boiler responded, "[T]he first part of your introduction is fine," and then clarified that it wanted something indicating that a "party acts in bad faith if its position is without substantial justification [and] whether a party's position was without substantial justification means that the position is frivolous." Day 5 Tr. at 30. Premier Boiler then said, "And that's directly from [W]aterjet Your Honor." Day 5 Tr. at 30.

So after discussing *Waterjet* with the parties, the court asked, "[A] party acts in bad faith if its position is without substantial justification. And then the sentence the phrase without substantial justification means that -- if that is the next sentence there is no objection?" Day 5 Tr. at 32–33. All parties agreed to that instruction without objection. Day 5 Tr. at 34. Premier Boiler renewed its objection to sending the bad faith question to the jury but did not object to the language of the jury instructions. *See* Day 5 Tr. at 34.

Later that day, the court provided the parties a draft of the jury instructions that reflected the earlier discussion. *See* Day 5 Tr. at 110; Doc. 207. The court asked

52

whether the parties had anything to discuss about the instructions, and Premier Boiler raised an issue with the instruction on damages, which the court resolved by an agreement between the parties. *See* Day 5 Tr. at 111–12. The court asked, "Are there any other matters we need to take up with respect to the jury instructions from Premier Boiler?" Day 5 Tr. at 112. Premier Boiler said, "I think we're all right, Your Honor." Day 5 Tr. at 112.

Premier Boiler did not object to the proposed general instruction that stated, "Ladies and gentlemen, the instructions that I gave you in the last phase of this trial continue to apply." Doc. 207 at 2; *see* Day 5 Tr. at 112–13. Nor did Premier Boiler ask the court to provide more robust general instructions or to repeat the Phase 1 preliminary instructions in full. *See* Day 5 Tr. at 112–13. Premier Boiler also did not object to the bad faith instruction that the parties had agreed to previously. *See* Day 5 Tr. at 112; Doc. 207 at 4. And Premier Boiler raised no issue with any alleged lack of definition of terms. *See* Day 5 Tr. at 112–13. Premier Boiler agreed that in the form discussed above, the instructions were ready to be printed for the jury. *See* Day 5 Tr. at 113. But now, well after the jury instructions were given, the jury returned a verdict, and the jury was discharged, Premier Boiler for the first time objects to its own proposed instructions. *See* Doc. 227 at 11. Yet Premier Boiler contends that it

53

"preserved its objection to the erroneous jury instructions." Doc. 242 ¶ 12. Premier Boiler argues that "even if the issue were deemed waived, the Court's instructions still constitute plain error warranting relief." *Id.*

As an initial matter, any error in the jury instruction on bad faith was invited error. *See United States v. Duldulao*, 87 F.4th 1239, 1254 (11th Cir. 2023) ("Under the doctrine of invited error, on appeal, a party may not challenge as error a ruling or other trial proceeding invited by that party. . . . Proposing the language of a jury instruction is a textbook case of invited error under our precedent." (cleaned up)); *id.* at 1255 ("And it enforces the notion, rooted in fairness, that someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation." (cleaned up)); *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005) ("Where invited error exists, it precludes a court from invoking the plain error rule and reversing." (cleaned up)). Here, Premier Boiler proposed the very jury instruction on bad faith that it seeks to challenge (albeit modeled after an instruction previously proposed by Mr. Isbell). *See* Doc. 206 at 9; Doc. 177 at 36.

Separately, Premier Boiler did not timely object to the Phase 2 jury instructions and thus waived its objection. *See* Fed. R. Civ. P. 51(d)(2). Rule 51

54

provides, "A party may assign as error . . . an error in an instruction actually given, if that party properly objected . . . ." Fed R. Civ. P. 51(d)(1)(A). And to "properly object," the party must make the objection when the court gives "an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered" or make the objection promptly after learning about a later-disclosed instruction. *See* Fed. R. Civ. P. 51(c)(2)(A)–(B), (b)(2). And when the party does make the objection, it "must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1).

Premier Boiler did not properly object to the bad faith instruction or the lack of further preliminary instructions. As explained above, Premier Boiler affirmatively approved the instructions given by the court and never "stat[ed] distinctly the matter objected to and the grounds for the objection." *See id.*; *Pate v. Seaboard R.R.*, 819 F.2d 1074, 1082 (11th Cir. 1987) (applying a plain error review standard where the parties "failed to object to the challenged charge on the grounds raised in this appeal," even though they objected to the same charge on two other grounds); *accord United States v. Starke*, 62 F.3d 1374, 1380–81 (11th Cir. 1995).

In any event, the court finds no plain error. At the start of Phase 1, the court gave the jury robust instructions, which explained that the parties each bore the

burden of proving their respective cases in support of their respective claims. Day 2 Tr. at 25–26. Premier Boiler concedes this. *See* Doc. 227 at 11. And at the end of Phase 1, the court again reminded the jury that "it is the responsibility of the party bringing any claim to prove every essential part of their claims by a preponderance of the evidence." Day 4 Tr. at 85. At the start of Phase 2, in his opening statement Mr. Isbell's counsel said, "Welcome to the second phase of this trial where your job is simple. . . . [T]his phase of the trial will be short, and we are here to prove two things to you, first Mr. Isbell's commissions and second the bad faith of Premier Boiler in making its trade secrets claim against Mr. Isbell." Day 4 Tr. at 142–43; Day 4 Tr. at 144 ("[T]he Alabama Trade Secrets Act gives you the jury the responsibility to decide whether a trade secret misappropriation claim was made in bad faith . . . ."). Premier Boiler's counsel in his opening explained to the jury, "Bad faith means that we would have had to know that we had no legal basis for the claim." Day 4 Tr. at 149. Mr. Isbell and IB&M then presented evidence about their bad faith allegations, and at the end of Phase 2, the jurors were reminded that the Phase 1 instructions "continue[d] to apply," just before the jurors were instructed that they "must decide whether Premier Boiler brought its trade secret claim in bad faith." Day 5 Tr. at 128. And the court then provided the agreed-upon definition of bad

faith. *See* Day 5 Tr. at 128.

"[I]n light of the allegations of the complaint, the evidence presented, and the arguments of counsel," the court is satisfied that "the jury was [not] misled and . . . the jury understood the issues." *Pate*, 819 F.2d at 1077. "At no point did the district court misstate the law as it pertains to the burden of proof or standard of causation." *McClow v. Warrior & Gulf Nav. Co.*, 842 F.2d 1250, 1253 (11th Cir. 1988) (emphasis omitted). And the Eleventh Circuit has held that there is no plain error where a "district court provided ample instruction as to the burden of proof from start to finish during its proceedings" and "the jury was adequately apprised of the burden of proof" when viewing the instructions "within the context of the entire trial, initial instructions, . . . and [second round of instructions]." *United States v. Burke*, 823 F. App'x 777, 782 (11th Cir. 2020). This lack of plain error persists even when the district court does not articulate the burden of proof as to each element in the second round of instructions and refers back to the robust first round of instructions, saying, "Now, of course what I told you yesterday . . . all of that still stands." *Id.* at 781; *see also United States v. Gutierrez*, 745 F.3d 463, 472 (11th Cir. 2014) ("A district judge is vested with broad discretion in formulating his charge to the jury so long as it accurately reflects the law and the facts." (cleaned up)).

57

And Premier Boiler's assertion that "[t]here had been no instruction in phase one that Defendants had a 'claim' for bad faith under the ATSA" is of no moment. *See* Doc. 242 ¶ 12. As the court explained to Premier Boiler earlier in the trial, the bad faith issue was not a separate claim, but a factual predicate that formed "part of a prevailing party fee provision." *See* Day 4 Tr. at 139–40. And the rest of the proceedings, instructions, and evidence made clear that Mr. Isbell and IB&M were the parties alleging that Premier Boiler brought the claim in bad faith, and therefore the ones with the burden to prove it.

And any omitted "definitions of what is frivolous, groundless in fact or in law, vexatious, or interposed for any improper purpose" do not meet the high bar of plain error. *See* Doc. 227 at 11. According to Premier Boiler, "[t]he failure to charge the jury with definitions of the terms is erroneous and misled the jury to Premier's prejudice." *Id.* at 12. Premier Boiler contends that "the lack of instruction on burdens of proof and elements at this phase of trial led the jury to falsely equate a finding of no liability with a finding of bad faith, which the jury ultimately did find." *Id.* Aside from a case explaining that undefined statutory terms should be given their "ordinary meaning" or "common usage," Premier Boiler's motion cites no authority for its argument that the lack of definition is plain error. *See id.* at 11–12 (quoting *U.S. v.*

58

*Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009)).

Premier Boiler's reply claims that "[b]y omitting these definitions, the Court left the jury to speculate about essential points of law, which constitutes plain error." Doc. 242 ¶ 13. But the cases Premier Boiler cites do not establish that the court committed plain error here. *See id.* (first citing *Pate*, 819 F.2d at 1083 and then citing *Admore v. Hospice of Palm Beach Cnty. Inc.*, No. 22-12280, 2024 WL 371948 (11th Cir. Feb. 1, 2024)). *First*, *Pate* discusses the general principle that there is plain error "[w]here a jury is given an erroneous charge which will mislead the jury or leave the jury to speculate as to an essential point of law." *Pate*, 819 F.2d at 1083. But no definition (or lack thereof) was at issue in that case. *See id.* And in *Admore*, the Eleventh Circuit affirmed a district court's jury instructions on the definition of "interference" because "[t]he trial court's instructions accurately tracked and elaborated on the pattern instructions," even though the jury instructions provided no definition for interference. *See Admore*, 2024 WL 371948, at *4. The Eleventh Circuit similarly affirmed the use of jury instructions that did not define certain terms when "[t]he pattern jury instructions do not include further definition of 'concealment,' and [the party] d[id] not suggest an alternative formulation." *United States v. Stevenson*, 663 F. App'x 831, 836 n.5 (11th Cir. 2016). There, the court

59

explained that "[a]n error is not plain if no Supreme Court precedent squarely supports the defendant's argument, other circuits are split, and [the Eleventh Circuit] ha[s] not resolved the issue." *Id.* at 836 (cleaned up). So when the party "cited no case to support her position that the omission of these definitions was erroneous," and the Eleventh Circuit found none, the court concluded that "the omission [of definitions] d[id] not constitute plain error." *Id.*

Here, the court's jury instructions tracked the exact language from the Alabama Supreme Court's definition of bad faith under the ATSA. *Compare* Day 5 Tr. at 128 (instructing the jury at the end of Phase 2), *with Ex parte Waterjet Sys., Inc.*, 758 So. 2d at 509. Premier Boiler proposed this language, and the parties agreed to it. *See* Doc. 206 at 9; Day 5 Tr. at 33–34. Premier Boiler proposed no other definitions for those terms.

Nor did Premier Boiler object to the statements during Mr. Isbell's closing that Premier Boiler now seeks to challenge. *See* Doc. 227 at 12; Day 5 Tr. at 132–33. Premier Boiler contends that "a miscarriage of justice" occurred because the lack of definitions "resulted in [improper] statements being made during closing." Doc. 227 at 12. Premier Boiler contends that Mr. Isbell's counsel improperly stated:

> First, was this case groundless in fact? Your verdict has answered that. Was this case groundless in law? You heard

60

> Judge Manasco give you the law, and in Alabama it is very strict to qualify as a trade secret. So you have, in essence, already found that it was groundless in law.

*See* Day 5 Tr. at 132; Doc. 227 at 12. Premier Boiler's counsel during his closing argued to the jury that such a view was wrong and that groundless in law had a different meaning:

> And don't you think that this legal team -- if this it was groundless in law, they could have stopped this lawsuit at some point. This legal team over here, but because there were issues in this case for a jury to decide, it shows that it was brought in good faith. . . . If it was brought in bad faith, there would be no issues for you to talk about when you all deliberated. But because you all deliberated, . . . it shows that the lawsuit was brought in good faith even if you ruled against us. The mere ruling against us doesn't mean that it was brought in bad faith. The fact that you all had to gather and listen to days of evidence and then talk about it shows the good faith in this case.

Day 5 Tr. at 140–41. Accordingly, Premier Boiler's argument that the jury was somehow duped into a miscarriage of justice because it was subjected to an unchecked rogue definition of bad faith cannot prevail. *See* Doc. 227 at 12. The jury listened to competing arguments about whether the facts showed bad faith and then received the definition of bad faith provided by the Alabama Supreme Court.

Premier Boiler is not entitled to judgment as a matter of law or a new trial on this ground.

61

### 4. The court did not err when it declined to poll the jury.

Premier Boiler next contends that the court erred in not polling the jury when it discovered "that some of the jurors had begun discussing the evidence in contravention of its instructions." *Id.* According to Premier Boiler, "Premier agreed with the Court that a poll would be appropriate." *Id.* at 13.

The court did not err for two reasons: (1) the court properly exercised its broad discretion in responding to the allegation of juror misconduct and (2) Premier Boiler resisted the court's suggestion of polling the jury and insisted that it would not be effective, though Premier Boiler later objected to the lack of polling after the court called the jury back to the courtroom.

*First*, Eleventh Circuit law is well settled that district courts have broad discretion when responding to alleged juror misconduct, and the district courts' decisions are afforded great deference. "The most salient aspect of the law in this area is the breadth of discretion given to judges who are called upon to deal with the possibility of juror misconduct." *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000). "District court judges deal with jurors on a regular basis, and those judges are in the trenches when problems arise." *Id.* "The problems that present themselves are seldom clearly defined and a number of variables have to be

considered." *Id.* "There are often no obviously right or wrong answers to the questions that arise." *Id.* "For all of these reasons, a trial judge is vested with broad discretion in responding to an allegation of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct such as premature deliberations, instead of external misconduct such as exposure to media publicity." *Id.* "In a number of decisions [the Eleventh Circuit] ha[s] held that when a jury problem involves the possibility of internal misconduct, the trial judge's discretion extends even to the initial decision of whether to interrogate the jurors." *Id.* (cleaned up). This is because "the district court is in a better position to evaluate credibility, . . . as well as the mood at trial and the predilections of the jury." *Id.* at 1247 (cleaned up). Even if another court "conceivably might have followed a different course and even arrived at a different result than the district court did . . . . [t]he whole point of discretion is that there is range of options open, which means more than one choice is permissible." *Id.* "The broader the discretion, the greater the range of choice and the less room for reversal." *Id.*

"When an allegation of juror misconduct arises, the court must determine whether the misconduct occurred and whether it was prejudicial." *United States v. Ifediba*, 46 F.4th 1225, 1238 (11th Cir. 2022). "But there is no bright-line rule

63

requiring a district court to investigate the internal workings of the jury whenever a defendant asserts juror misconduct." *Id.* (cleaned up). The Eleventh Circuit has "long recognized a distinction between the dangers of improper communication amongst jurors and communications between jurors and outsiders to the litigation." *United States v. Bradley*, 644 F.3d 1213, 1276 (11th Cir. 2011). On the one hand, "allegations of juror misconduct concerning outside influences must be fully investigated to determine the scope of the misconduct and to ensure no prejudice results." *Id.* at 1277. On the other hand, "[t]he district court's discretion . . . is at its zenith when the alleged misconduct relates to statements made by the jurors themselves, and not from media publicity or other outside influences." *Id.*

"A district court has broad discretion in deciding whether to interrogate jurors regarding alleged misconduct." *Ifediba*, 46 F.4th at 1238 (cleaned up). "Logically, should evidence come to the court's attention that jurors might have disobeyed the instruction, district courts have the power to investigate the possibility of premature deliberation." *Bradley*, 644 F.3d at 1276. But "individual questioning of the jury is not to be undertaken lightly. It has the potential to 'aggravate the situation' by drawing attention to misconduct." *Ifediba*, 46 F.4th at 1241. So "[t]here is no per se rule that requires a district court to investigate all claims of juror misconduct, and a

64

district court has the discretion to decide a motion for a new trial without conducting an evidentiary hearing to investigate." *Torres v. First Transit, Inc.*, 979 F.3d 876, 882 (11th Cir. 2020); *accord United States v. Cuthel*, 903 F.2d 1381, 1382 (11th Cir. 1990) (collecting cases). "[T]he district court [i]s in the best position to determine whether the jury's discussion of the case prior to submission could be cured from error by instructions as given." *Dominguez*, 226 F.3d at 1248 (cleaned up). But "[a] court abuses its discretion and commits reversible error when it fails to investigate as thoroughly as the situation requires and the insufficient investigation prejudices the defendant." *Ifediba*, 46 F.4th at 1238.

Two cases instruct the court's ruling here. *First*, the Eleventh Circuit upheld a district court's decision not to poll each juror or inquire about contents of discussions even after a juror made clear on the eighth day of a nine-day trial that "there had been some discussion of the case among at least some of the jurors" prior to deliberations. *See Dominguez*, 226 F.3d at 1247. In *Dominguez*, a juror asked to be excused from further participation as a juror. *Id.* at 1243. The court interviewed the juror on the record in the presence of counsel, and the juror explained that there had "been discussions about the facts of th[at] case among the jurors" and "[t]here is apparently a general consensus." *Id.* at 1244. But when the court asked whether

65

the jury could keep an open mind and render a fair verdict, the juror stated, "[T]here has been a little—everyone is waiting until the end. However, we talk." *Id.* at 1245. But when the court asked if anyone had made up their minds, the juror responded, "Not, per se." *Id.* The court declined to ask any further questions, denied the motion for a mistrial, and refused to excuse the juror. *Id.* at 1245–46. "[F]ifty transcript pages later," the court reminded the jury to keep an open mind to additional evidence and asked the jurors again to refrain from discussing the case prematurely. *Id.* at 1246. "There were no objections to that instruction or any request for further instructions on the subject." *Id.* And when court adjourned for the day, the court reminded "the jurors that it was very important they not discuss the case with anyone." *Id.* The Eleventh Circuit upheld the district court's decisions. *Id.* at 1247. The Eleventh Circuit's conclusion was "reinforce[d]" by the fact that "the court repeatedly instructed the jurors, both before and after its investigation into the alleged jury misconduct, that [the defendant] was presumed innocent, that the jury should not discuss the case until the evidence was completed, and that their verdict must be based only upon the evidence presented at trial." *Id.* at 1247–48. And "the district court was in the best position to determine whether the jury's discussion of the case prior to submission could be cured from error by instructions as given." *Id.*

66

at 1248 (cleaned up).

*Second*, the Eleventh Circuit upheld a district court's decision not to interview each juror individually after a juror raised concerns about juror impartiality. *See United States v. Harris*, 908 F.2d 728 (11th Cir. 1990). In *Harris*, the court learned that a juror commented to a fellow juror during trial that "these guys sitting across from us think they're going to get off on this." *Id.* at 732–33. One of those same jurors later stated, "[D]o it to him good" as a Drug Enforcement Agency agent was about to testify. *Id.* at 733. The parties asked the court to interview the jurors involved and moved that the jurors be excused or that the court declare a mistrial. *Id.* The court instead "asked the jury as a group whether any juror has made any kind of decision up to this point that he or she could not keep a completely open mind until all of the evidence is in, and until the case has been explained to [them]." *Id.* (cleaned up). "No juror responded affirmatively and the trial continued." *Id.* Though the district court held that the juror's statement "conveyed some conclusion adverse to the defendants," the Eleventh Circuit explained that the statement "does not suggest serious jury contamination." *Id.* at 734 (cleaned up). The Eleventh Circuit held that "[t]he district court cured any possible taint by questioning the jurors on their ability to remain impartial and giving them an admonition to keep an open

67

mind." *Id.* And because "[n]o juror indicated an inability to remain impartial, . . . the district court did not abuse its discretion in refusing to further investigate the first alleged remark indicating juror misconduct." *Id.*

The court was and is satisfied that no further investigation of the alleged juror misconduct was necessary in this case. Here, on day four of a five-day trial, "a single juror, outside the presence of the rest of the jury, . . . let [the courtroom deputy] know that some of the jurors, but not all, [we]re discussing the evidence." Day 4 Tr. at 27. Premier Boiler moved for a mistrial. Day 4 Tr. at 29. Mr. Isbell responded that "[t]here is no evidence that anything particularly untoward ha[d] happened." Day 4 Tr. at 29. And Mr. Isbell and IB&M agreed that based on the juror's single comment, there was no indication that "the jury has been so tainted that it would create any prejudice whatsoever." Day 4 Tr. at 30.

Premier Boiler disagreed. Premier Boiler contended that because the jury "already disregarded one of [the court's] most clear, specific, and easy instructions," Premier Boiler was not confident that the jury would follow any of the court's other instructions. Day 4 Tr. at 30–31. Premier Boiler also argued that the juror's comment did not reveal whether any jurors had been swayed by the discussion. Day 4 Tr. at 30. The court asked Premier Boiler if its concerns would be addressed "if the Court

68

were to individually poll the jury." Day 4 Tr. at 31. Premier Boiler emphatically stated, "I'm not confident that they would truly admit yes, I have been persuaded. I think their responses would be to please the Court versus really getting to the heart of the matter." Day 4 Tr. at 31. The court explained that the law "operate[s] from a presumption that jurors are truthful with the Court when they're asked questions," and proposed to ask the jurors individually whether they understood the instruction, understood its importance, had an open mind, and could maintain an open mind. Day 4 Tr. at 31. Premier Boiler again stated, "I guarantee you they will say yes to all of those questions even though they have discussed the case amongst themselves in violation of [the court's] instruction." Day 4 Tr. at 31. Mr. Isbell argued that because there was "no evidence whatsoever of any prejudice at this point," the court should just give a curative instruction reminding the jurors not to discuss the case prematurely. Day 4 Tr. at 32.

Premier Boiler agreed with the court that "there's not case law that this is an automatic mistrial," so the court asked Premier Boiler why a poll and a curative instruction was not sufficient. Day 4 Tr. at 32. The court explained that if it conducted a poll, it would call the jurors in one by one and take a "uniform approach of assessing whether each juror is prejudiced and willing to listen with an open mind

69

at [that] time." Day 4 Tr. at 33. The court described that it would call each juror to sit in the juror's seat in the jury box, to avoid the defensiveness that could arise if each juror were put on the stand under oath. Day 4 Tr. at 34. Premier Boiler disagreed with the court's plan, yet again emphasizing a distrust for the jurors' willingness to tell the truth. Day 4 Tr. at 34.

Mr. Isbell again objected to the poll, arguing that it was not warranted. Day 4 Tr. at 34. Mr. Isbell did not want the jurors to feel as though they were in trouble with the court based on the understanding of one juror, who could be misunderstanding something innocent. Day 4 Tr. at 34. IB&M agreed and emphasized the advanced age of the case due to "repeated delays" from Premier Boiler. Day 4 Tr. at 35. IB&M also echoed that the juror may have misunderstood the nature of the other jurors' conversation. Day 4 Tr. 35–36.

The court offered Premier Boiler the "[l]ast word" on the issue. Day 4 Tr. at 36. Premier Boiler maintained its belief that it had been prejudiced and that a mistrial was necessary but made no further comment about the prospect of polling the jury. Day 4 Tr. at 36. So the court noted "everybody's objection to the poll," and stated that it would not conduct the poll. Day 4 Tr. at 37. The court was "satisfied . . . that the requirement of unanimity is some guardrail against the possibility . . . of

70

prejudice" and informed the parties that the court would give a curative instruction. Day 4 Tr. at 37. The court then asked if there was anything else that needed to be addressed before the jury returned to the courtroom. Day 4 Tr. at 37. Because the parties indicated that there was nothing, the court instructed the courtroom deputy to retrieve the jury. Day 4 Tr. at 37. After the discussion had ended and the courtroom deputy was retrieving the jury, Premier Boiler added, "And just for the record, we also object to you not doing the poll that you previously suggested." Day 4. Tr. at 37.

When the jury returned, the court issued the following instruction:

> I want to remind all of you about one of the instructions that I gave you before the trial began which was that you are not to begin discussing any of the evidence in the case until all of evidence is in. You may remember that I said that premature deliberations could lead to a premature decision, and I emphasized the importance of maintaining an open mind until you have heard all of the evidence in the case and my instructions on the law and the moment has come for you to begin deliberating amongst yourselves about the evidence.
>
> I assume that all of you to this point do retain that open mind and ask that if any of you feel that you are no longer able to render a fair and impartial decision in the case that you individually communicate with [the courtroom deputy], and we will be able to have a conversation. But I want to emphasize to you the importance of not deliberating about any of the evidence until all of the

71

evidence is closed.

Day 4 Tr. at 38. None of the jurors ever contacted the courtroom deputy to indicate trouble with fairly or impartially rendering a verdict. When court adjourned for the day, the court again reminded the jurors of the instruction not to discuss the evidence amongst themselves. Day 4 Tr. at 152.

The court is satisfied that, in the light of all the circumstances, there was no prejudicial juror misconduct. As an initial matter, the allegations of premature discussion did not include any indication that any jurors had prejudged any party's case or that the jurors' minds were made up. Further, the court repeatedly—both before and after the allegation—admonished the jury of the importance of waiting to deliberate or make a decision until all the evidence had been presented. *See United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011) ("We presume that jurors follow the instructions given by the district court."). In the light of the parties' adamancy about the futility of an individual poll (though Premier Boiler later cursorily changed its mind), the court opted to address the jury collectively. In doing so, the court reminded the jurors of the instructions against discussing the case prematurely and provided the jurors a private option to raise any concern they may have about their ability to decide the case fairly and impartially with an open mind.

72

The court declined to draw any further attention to the matter through a deeper inquisition. Based on the court's view of the jury's rapt attention and careful listening across the five-day trial, the jury's opportunity to privately disclose any concerns about a fair verdict, and the court's repeated instructions the importance of not deliberating prematurely, the court is satisfied that an individual poll of the jury was not necessary. Accordingly, the court finds unpersuasive Premier Boiler's argument that because the jury deliberated for less than an hour and did not reach a split verdict, the premature deliberations necessarily prejudiced Premier Boiler. *See* Doc. 227 at 14.

Further, Premier Boiler's current contention that the court should have polled the jury flies in the face of the obstinate, repeated arguments that Premier Boiler made against such a poll. Premier Boiler "guarantee[d]" the court that any such poll would not garner truthful responses, and the court would be unable to "get to the truth." Day 4 Tr. at 31. And while Premier Boiler later objected to the lack of a poll—after the discussion had ended and the jury was returning, the court remains satisfied that any objection Premier Boiler preserved does not warrant a new trial.

Accordingly, Premier Boiler is not entitled to judgment as a matter of law or a new trial on this ground.

73

### 5.  The court did not err in bifurcating the trial.

Premier Boiler next argues that the court erred in bifurcating the trial. Doc. 227 at 15–16. It was well within the court's discretion to bifurcate the trial, and Premier Boiler waived any objection it might have had to the court's decision. But now, according to Premier Boiler, the court's decision to bifurcate the trial was erroneous because "Premier's damages encompassed a large portion of its case and its damages were inextricably intertwined with its claims." *Id.* at 15.

On the first day of trial, the court allowed the *voir dire* of Premier Boiler's offered expert witness, Mr. Wright, to aid the court in ruling on Mr. Isbell's motion in limine to exclude Mr. Wright's testimony. *See* Day 1 Tr. at 69; Doc. 146; Doc. 113. The court had previously reserved ruling on the motion in limine. *See* Doc. 138 at 17. During the *voir dire*, the court became seriously concerned about allowing Mr. Wright to testify. Mr. Wright described his extensive causation analysis, and it became apparent to the court that his assumptions about and investigation into liability "are baked into the growth rate that he has used such that if defendants ask why the growth rate appears as it does in his calculations his answer is going to involve him reciting facts that are the jury's province to find." Day 1 Tr. at 104–48. Because the court realized that it could not, while abiding by binding Eleventh

74

Circuit law, "allow a full and fair cross-examination" of Mr. Wright without injecting error, the court asked whether the parties had considered bifurcating the trial. Day 1 Tr. at 148. The court made clear that it was offering "bifurcation as an additional item for consideration" in the light of the concerns about Mr. Wright's testimony, but stated, "If what the parties would prefer is just a ruling on the motion I can do that." Day 1 Tr. at 151. Premier Boiler stated, "I prefer a bifurcated trial." Day 1 Tr. at 151. The court gave the parties until the following morning to notify the court of whether the parties would like a ruling on the motion in limine or to proceed with a bifurcated trial. Day 1 Tr. at 152. That night, the defendants emailed chambers and requested a ruling on the motion to exclude Mr. Wright. Doc. 227-1 at 1. Premier Boiler stated, "In light of the Court's stated concerns regarding confusing the jury, Premier agrees with the Court's assessment that a bifurcated trial would alleviate those concerns. For that reason, Premier is willing to proceed with a bifurcated trial." Doc. 227-2 at 1.

The next morning, the court denied the motion to exclude and bifurcated the trial. Day 2 Tr. at 2. The court allowed the parties to discuss their thoughts about the bifurcation and addressed questions and concerns. Day 2 Tr. at 2–9. The defendants raised concerns about efficiency, time, and cost. Day 2 Tr. at 4–6. But the defendants

75

acknowledged that "it is well within the Court's power under the rules of civil procedure to make a determination as to bifurcation, even sua sponte." Day 2 Tr. at 5. After the defendants further discussed concerns about trial logistics, Premier Boiler stated, "I think bifurcation is the solution, and however that plays out, scheduling wise, time wise, logistically, we will have to deal with that, but I think bifurcation is the best and most efficient and fairest way to deal with that." Day 2 Tr. at 9.

Premier Boiler never objected to the court's decision to bifurcate the trial. When the court asked whether the parties wanted to include a jury instruction specifically about bifurcation, Premier Boiler stated, "We would certainly agree that we need something that explains to them the specific assignment they have." Day 3 Tr. at 117. Premier Boiler again did not object to bifurcation. Day 3 Tr. at 117. Premier Boiler negotiated a bifurcation instruction with counsel, which the court thoroughly discussed with the parties. Day 4 Tr. at 15–17, 78–79. And Premier Boiler stated that it had no objection to the agreed-upon instruction. Day 4 Tr. at 78–79. In short, Premier Boiler waived any objection it had to the court bifurcating the trial.

And in any event, the trial court has discretion to bifurcate a trial, even over a

76

party's objection. *See* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."); *Harrington v. Cleburne Cnty. Bd. of Educ.*, 251 F.3d 935, 938 (11th Cir. 2001) ("Fed. R. Civ. P. 42(b) confers broad discretion on the district court in this area, permitting bifurcation merely 'in furtherance of convenience.' That is not a high standard, and the district court's concern for clarifying the issues to be tried suffices to permit the court to separate the trials.").

Accordingly, Premier Boiler is not entitled to judgment as a matter of law or a new trial on this ground.

### 6. The court did not err by excluding Tyler Wright as a fact witness in the damages phase of the trial.

On the fifth day of the trial, during Premier Boiler's Phase 2 case-in-chief, Premier Boiler sought to call its damages expert, Mr. Wright, as a witness. Day 5 Tr. at 114. Premier Boiler explained that it was "calling him as a fact witness only." Day 5 Tr. at 114. After the court "express[ed] significant concern about that, about an expert testifying as a fact witness" because "[t]he jury gets told they're an expert," Premier Boiler said, "No, I am not mentioning expert." Day 5 Tr. at 114. Premier Boiler explained that "the anticipated subject of [Mr. Wright's] testimony" was "his

77

name, education and background, and . . . his examination of the facts so that he could come to a comfort level to be able to make a report." Day 5 Tr. at 114. Premier Boiler explained that it was "trying to ask him questions to get at what Mr. Davies might have considered." *See* Day 5 Tr. at 115. But, the court explained, "[T]he jury assigns greater weight to experts when they're dressed up as fact witnesses." Day 5 Tr. at 115. Premier Boiler lamented that it was "struggling . . . trying to show good faith in bringing this lawsuit and continuing with this lawsuit." Day 5 Tr. at 115. So Premier Boiler wanted to show that "another thing that [Mr. Davies] relied on that helped shape his opinions and his decision about going forward was what he learned from his expert." Day 5 Tr. at 116. The court emphasized that it was "not saying that nothing about the expert can come in." Day 5 Tr. at 117. Premier Boiler could still "ask the person who considered that expert's opinion. And [it] could ask him whether they thought it was good or bad or gave it weight or didn't give it weight, but [Premier Boiler] would have to ask the recipient of it." Day 5 Tr. at 116.

Ultimately, the court gave Premier Boiler latitude to ask Mr. Davies about what he considered and the source of that information, but the court would not allow "evidence or testimony cumulative to what Mr. Davies has already said that presents an almost certain risk of reversible error in the trial." Day 5 Tr. at 116–17. The court

clarified that it was "not allowing Mr. Wright to testify . . . at this stage about matters related to Mr. Davies'[s] good faith and his decisions about the lawsuit," though Mr. Davies was still welcome to testify as to what Mr. Davies considered when making his litigation decisions, such as "[i]f the expert performed calculations that went into Mr. Davies'[s] consideration about whether to bring the lawsuit." *See* Day 5 Tr. at 118–19.

Premier Boiler then decided not to call Mr. Davies to talk about his consideration of Mr. Wright's calculations. *See* Day 5 Tr. at 118–19, 127.

Premier Boiler now contends that "[t]his failure to allow Mr. Wright to testify in any capacity was erroneous and should be grounds for a new trial." Doc. 227 at 18. According to Premier Boiler, "the Eleventh Circuit does allow expert witnesses to testify as fact witnesses." *Id.* at 17 (citing *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 71 F.4th 894 (11th Cir. 2023)).

Premier Boiler misses the point. "[A] properly disclosed and qualified expert can testify as both an expert and a fact witness." *Travelers Prop. Cas. Co. of Am.*, 71 F.4th at 907. But "Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory

79

committee's note to 2000 amendment. "[A] lay witness can only speak to what he in fact observed." *Travelers Prop. Cas. Co. of Am.*, 71 F.4th at 906. Rule 701 permits opinions, but only those "rationally based on the witness's perception" that help clarify the lay witness's actual observations, and which do not rely "on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

Mr. Wright was properly excluded under this standard. Premier Boiler sought to have Mr. Wright testify as to "his name, education and background, and . . . his examination of the facts so that he could come to a comfort level to be able to make a report." Day 5 Tr. at 114. Premier Boiler wanted Mr. Wright "to testify as to what he examined and performed in this case." Doc. 227 at 17. Specifically, Premier Boiler wanted Mr. Wright to "testify that in his opinion, Premier was damaged by $1.7 million by the actions of these two defendants." Day 4 Tr. at 149. Mr. Wright was offered for his opinion on harm caused by the defendants, and such opinion required a diagnostic explanation far more complex than simply observing facts as a layperson would. *See Thelen v. Somatics, LLC*, 156 F.4th 1115, 1132 (11th Cir. 2025). Mr. Wright was hired well after Premier Boiler decided to pursue this litigation, *see* Day 5 Tr. at 64, and he admitted that in forming "observations" and opinions about Premier Boiler's business harm, he "just didn't make Premier's

historical financial information and project it into the future assuming all of Premier's losses are associated with the trade secrets," Day 1 Tr. at 138–39. Instead, he "had to consider the potential that there was [legal] competition and [he] had to account for that competition in [his] calculation of losses." Day 1 Tr. at 139. Rule 701 expressly prohibits lay opinions based on scientific, technical, and specialized knowledge. *See* Fed. R. Evid. 701(c). Opining on the effect of the defendants' actions or any test that Mr. Wright "performed in this case" required a complex calculation process, plainly calling for scientific and technical reasoning. *See* Doc. 227 at 17; *Thelen*, 156 F.4th at 1132–33. Any opinion Mr. Wright might have offered on the state of Premier Boiler's business and the effect of the defendants' actions would not be the proper subject of lay witness testimony. *See Thelen*, 156 F.4th at 1133.

Premier Boiler contends that even if Mr. Wright were inadmissible as an expert, "[a]ppropriate guardrails could have been employed to ensure that Mr. Wright's testimony would be limited to what he examined and performed." Doc. 227 at 17. Even if Mr. Wright sought to testify only as to the facts he uncovered while forming his calculations, such "evidence or testimony [was] cumulative to what Mr. Davies ha[d] already said" or was otherwise inadmissible. *See* Day 5 Tr.

81

at 117. For example, Mr. Wright explained during *voir dire* that in forming his calculations, he talked to Mr. Davies, who "said that Mr. Isbell and he were having some difficulties during this time . . . in regards to the effort being put in, and he felt like Mr. Isbell wasn't putting in his full effort any longer at the business." Day 1 Tr. at 136. Mr. Davies could have testified as to his thoughts about Mr. Isbell, but Mr. Wright's testimony about what Mr. Davies said would have been inadmissible hearsay. *See* Fed R. Evid. 801. And as to any testimony that Mr. Wright could have provided about diminishing revenue, worsening financial status, belief that Mr. Isbell was causing those woes, or any other damages-related fact that Mr. Wright examined, the court repeatedly told Premier Boiler that Mr. Davies was the appropriate fact witness to testify as to all of that. *See* Day 5 Tr. at 116 ("The only way to get that in without running afoul of the rule against experts testifying as fact witnesses would be to ask the person who considered that expert's opinion. . . . [T]his is why I allowed all of these questions to Mr. Davies.").

Mr. Wright conceded that "Premier provided [him] the data that [he] rel[ied] on in [his] analysis." *See* Day 1 Tr. at 70; Day 5 Tr. at 118. So allowing Premier Boiler to give the jury Mr. Wright's "name, education and background" (establishing him as a purported expert) before he recited facts that were provided to him by

82

Premier Boiler and readily available for testimony by Mr. Davies would have evaded "the reliability requirements set forth in Rule 702 . . . through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

The simple question the jury had to decide was whether Premier Boiler brought its misappropriation claim in bad faith. That question revolves around Mr. Davies's decisions in real time, not Mr. Wright's litigation opinion prepared after the fact. The court allowed broad latitude for Premier Boiler to probe Mr. Davies's thoughts and motivations about bringing this lawsuit, as well as things he considered, advice he was given, estimations of the value of his claims, and more. *See* Day 5 Tr. at 116. Premier Boiler chose not to go any further even after the court made clear its ruling on Mr. Wright's testimony, and Premier Boiler chose not to call Mr. Davies to explain what, if any, of Mr. Wright's information impacted Premier Boiler's litigation decisions in this case. *See* Day 5 Tr. at 118–19, 127. And when Premier Boiler examined Christian Davies—co-owner of Premier Boiler—after the court's ruling on Mr. Wright, Premier Boiler asked no questions of Ms. Davies about what she or her husband considered when deciding whether to bring this lawsuit. *See* Day 5 Tr. at 120–27.

83

Mr. Isbell and IB&M also emphasized that "Premier failed to preserve this issue because (a) it never made a proffer of the 'substance' of Mr. Wright's factual testimony and (b) it failed to identify a 'substantial right' affected by the ruling." Doc. 236 ¶ 5; Doc. 238 at 9. Even if such a proffer were not necessary because "the substance [of the testimony] was apparent from the context," *see* Fed. R. Evid. 103(a)(2), the court committed no error when it excluded Mr. Wright's testimony, *see Thelen*, 156 F.4th at 1132 ("Ultimately, a trial court has 'considerable leeway' in exercising its discretion to admit or exclude expert testimony." (cleaned up)); *see United States v. Hawkins*, 934 F.3d 1251, 1261 (11th Cir. 2019) (finding plain error where an expert witness "interpreted unambiguous language, mixed expert opinion with fact testimony, and synthesized the trial evidence for the jury [and] [h]is testimony strayed into speculation and unfettered, wholesale interpretation of the evidence" (cleaned up)).

Accordingly, Premier Boiler is not entitled to judgment as a matter of law or a new trial on this ground.

### 7. The court did not err in denying the motion for judgment as a matter of law on Mr. Isbell's commissions.

Premier Boiler next contends that the court should have granted Premier Boiler's motion for judgment as a matter of law on Mr. Isbell's counterclaim. *See*

84

Doc. 227 at 18. According to Premier Boiler, "[t]he testimony at trial was unrefuted that there were no outstanding issues regarding payment of commissions to Mr. Isbell before he left Premier." *Id.* And even if there were issues, "[t]here was . . . no testimony that Premier owed Isbell commissions for specific jobs. It was general allegations that he was unpaid, and the jury picked a number out of thin air for his damages." *Id.* at 19.

Mr. Isbell responds that "Premier did not move for judgment as a matter of law on Isbell's counterclaim in Phase 1," so "Premier cannot move for judgment as a matter of law post-verdict." Doc. 236 ¶ 6. Premier Boiler replies that it "moved for judgment as a matter of law on the ground that Isbell failed to present sufficient evidence of damages to reach the jury." Doc. 242 ¶ 9.

On Day 5 of the trial, after the defendants rested their cases, Premier Boiler moved for judgment as a matter of law on "Mr. Isbell's unpaid commission claim" because, Premier Boiler argued, "there [was] no legitimate legally sufficient evidentiary basis for a jury to conclude that [he] [met] the legal elements to sustain a breach of contract claim because no reasonable jury could conclude he is entitled to unpaid commissions on all jobs in Alabama, Mississippi, and Tennessee as well as all parts sales in those states." Day 5 Tr. at 102. According to Premier Boiler,

85

"[t]he evidence is such that Isbell's own evidence does not support an award of any commissions because the numbers are faulty." Day 5 Tr. at 102. Premier Boiler did not move for judgment as a matter of law during the first phase of the trial, *see* Day 4 Tr. at 65–66, when the jury decided that "Isbell proved he did the things the contract required him to do, but Premier Boiler breached or broke the contract" and "Isbell proved Premier Boiler's breach of contract caused him harm," Doc. 211.

But Phase 2 is when the jury decided the amount of Mr. Isbell's damages. *See* Doc. 212. And Premier Boiler appears to be challenging the sufficiency of the evidence as to the amount of damages in its post-verdict motion for judgment as a matter of law. *See* Day 5 Tr. at 102; Doc. 227 at 18. Accordingly, it is not clear to the court that Premier Boiler waived its right to make such a post-verdict motion for judgment as a matter of law.

In any event, Premier Boiler's post-judgment motion is due to be denied. The jury heard Mr. Davies admit that there were significant discrepancies between the document Premier Boiler created and used to track Mr. Isbell's commissions and the actual invoices billed by Premier Boiler. *See* Day 2 Tr. at 165–84. He admitted that "[i]t looks like there could probably be a lot of stuff left off," including entire jobs. *See* Day 2 Tr. at 184. And even though Mr. Davies maintained that Mr. Isbell was

86

paid based on the invoices at a correct rate, rather than the errant Premier Boiler-created document, he promised the jury proof of such payments but never provided it, and a juror inquired about that broken promise. *See* Day 2 Tr. at 176; Day 4 Tr. at 26.

Mr. Isbell's counsel led Mr. Davies through the purported commission-tracking spreadsheet, which Premier Boiler provided in discovery in response to a request for "the amount of any and all commission payments which were to be paid to Paul Isbell, the amount of each commission payment which was made to him, and any commission payments which are due and owing to Isbell but have not been made to him." Day 5 Tr. at 42. That discussion revealed several jobs that were missing from the sheet, as well as glaring discrepancies between the commission sheet and Premier Boiler's financial records. *See* Day 5 Tr. at 42–54. Mr. Davies was questioned extensively about Premier Boiler's "financial records including records covering the time of Mr. Isbell's employment during 2020 through 2022." *See* Day 5 Tr. at 46–54. The jury heard his testimony about Premier Boiler's total sales in Mr. Isbell's territory during Mr. Isbell's employment with Premier Boiler. *See id.*

The jury also heard that Premier Boiler agreed to pay Mr. Isbell 5% commission on all work that he brought in, based on the profitability of the job. *See*

87

Day 5 Tr. at 65. And Mr. Isbell testified that on the jobs he priced, he used a 40% profit margin. *See* Day 5 Tr. at 66. But, Mr. Isbell testified, despite doing jobs that were due to be paid after he left Premier Boiler, he had not received any commission checks since he left Premier Boiler. Day 5 Tr. at 67. For example, Mr. Isbell explained (while looking at Premier Boiler's financial records), that Premier Boiler was paid nearly $1 million after he left, but he never received commissions on those jobs. *See* Day 5 Tr. at 75.

Mr. Davies's wife testified that "to the extent that Mr. Isbell is owed commissions after he left," the jury could take Premier Boiler's invoiced amount and multiply it by the profit margin (23% or 40%, depending on which margin the jury believed had been used) and then multiply that by the 5% commission rate. Day 5 Tr. at 127. So that is what Mr. Isbell asked the jury to do, using the numbers from Premier Boiler's financial records. *See* Day 5 Tr. at 130.

Based on his calculations, Mr. Isbell requested $88,295. Day 5 Tr. at 130–31. But the jury also heard evidence that Mr. Isbell had already been paid some commissions and that there were not "any outstanding issues regarding payments of his commissions" when Mr. Isbell left. *See, e.g.*, Day 5 Tr. at 84–88, 124.

As explained above, when the jury is confronted with conflicting testimony

88

and evidence, it is the province of the jury—not the court—to make credibility determinations. Even if Premier Boiler's inaccurate bookkeeping precluded the jury from determining the exact dollar amount of unpaid commissions with total certainty, that was not required. *See Certainty—Causation and Amount*, Alabama Law of Damages § 2:7 (6th ed.) ("If the evidence furnishes data for an approximate estimate of the amount of damages, it is sufficient to support a judgment. . . . [A] party who breaches his contract cannot escape liability because of difficulties in finding a perfect measure of damages, but it is enough that the evidence furnishes data for an approximate estimate of the damages."). These damages did not rest on pure speculation, but on a credibility determination by the jury after hearing thorough evidence about the actual profit incurred by Premier Boiler and the Premier Boiler-created commission-tracking document. So the court properly denied Premier Boiler's motion for judgment as a matter of law, which it does again here. Accordingly, Premier Boiler is not entitled to judgment as a matter of law or a new trial on this ground.

### C. Premier Boiler's Motion for Sanctions

Premier Boiler "moves the Court to impose sanctions, including attorneys' fees, against Defendant Paul Isbell and his counsel of record" due to the breach of

89

the protective order. Doc. 228 at 1. Premier Boiler contends that the court should sanction Mr. Isbell and his attorneys because after the breach of the protective order, Mr. Isbell gave information to IB&M, which IB&M provided to the Alabama Licensing Board, and the Board investigated Premier Boiler, finding various regulatory violations and leading to fines. *See* Doc. 228. And according to Premier Boiler, when the court allowed limited discovery into the protective order breach, Mr. Isbell's counsel initially agreed to exchange disclosures but then refused to cooperate or provide any information. *See id.* at 5–7.

As an initial matter, Mr. Isbell contends that Premier Boiler's motion for sanctions is untimely. Doc. 237 ¶ 1. Regardless whether the motion was timely, it is due to be denied.

Premier Boiler invokes three bases for the sanctions: (1) Federal Rule of Civil Procedure 37(b)(2)(A), (2) the court's "authority to issue sanctions set forth in the Protective Order," and (3) "the Court's inherent power to sanction activity constituting 'bad faith.'" Doc. 228 ¶¶ 31, 33.

*First*, Rule 37 does not permit sanctions for violations of a protective order. The Rule cited by Premier Boiler—provides:

> If a party . . . fails to obey an order to provide or permit discovery, . . . the court must order the disobedient party,

90

the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2)(A), (C). The Eleventh Circuit has held that "a Rule 26(c) protective order is not an order to provide or permit discovery, and therefore, such orders do not fall within the scope of Rule 37(b)(2)." *See Lipscher*, 266 F.3d at 1323 (cleaned up) (reversing an award of attorney's fees for breach of a protective order on the basis of Rule 37).

*Second*, Premier Boiler invokes "the authority to issue sanctions set forth in the Protective Order." Doc. 228 ¶ 31. But the protective order merely states, "If any person having access to the Confidential Material herein shall violate this Order, he/she may be subject to sanctions by the Court and may be liable to pay for the damages caused by his/her violation." Doc. 49 ¶ 19. This is simply a notice provision, not a freestanding source of authority for the court to impose a sanction. Separately, Premier Boiler has not established any damages caused by the violation. Premier Boiler has repeatedly asserted that it was damaged by the protective order breach, but despite ample opportunity to investigate such damages and establish them, as explained below, Premier Boiler has not done so. *See* Doc. 228 ¶ 10. The only specific "sanction" that Premier Boiler requests is attorney's fees, but it has not

91

requested an amount of fees attributable to the breach or established a universe of such fees. *See* Doc. 228. Otherwise, Premier Boiler just repeats its demand for "sanctions" writ large, with no proposal for what appropriate sanctions may be. *See id.*

*Third*, Premier Boiler has failed to establish the subjective bad faith or egregious conduct required for the court to sanction Mr. Isbell or his counsel under the court's inherent authority. *See Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("To exercise its inherent power a court must find that the party acted in bad faith."). Mr. Isbell's counsel appears to concede a degree of carelessness in enforcing a protocol effective against improper disclosures, *see* Doc. 237 ¶ 8, but this falls short of bad faith.

Premier Boiler acknowledges that "[a]s the movant, [it] has the burden of establishing by clear and convincing evidence that the defendant acted in bad faith to recover under the Court's inherent power." Doc. 228 ¶ 32. Premier Boiler has not carried that burden.

Premier Boiler claims that "Isbell and his attorneys demonstrated bad faith by delaying and disrupting the trial by [their conduct], including the fact that the trial itself was delayed based on said actions." *Id.* Premier Boiler cites eight things that

92

allegedly show that "Isbell and his attorneys possessed . . . bad faith," *id.* ¶ 33: (1) "Isbell's express knowledge that he was in possession of documents that had been deemed 'Highly Confidential' and were for 'Attorneys' Eyes Only,' and his ensuing decision to" give those documents to IB&M "for purposes of tipping off the Alabama Licensing Board"; (2) "[t]he damage to Premier's customer relationships resulting from the Board's ensuing investigation"; (3) "[t]he inexplicable eleventh-hour confession[,] . . . which caused the September 8 trial date to be postponed to November 17"; (4) "[t]he inconsistent testimony and representations to the Court regarding the scope of the violation of the Protective Order"; (5) "[t]he complete failure on the part of Isbell and his attorneys to comply with the very discovery schedule they proposed at the September 8 meet-and-confer"; (6) "[t]he refusal on the part of Isbell to produce any of the vital transmittal information regarding the breach of the Protective Order until September 23, 2025"; (7) "[t]he inability of Premier to adequately prepare for any depositions of the parties related to the breach of the Protective Order as a result of Isbell's failure to comply with the agreement of the parties regarding the discovery process"; and (8) "[t]he inability of Premier to adequately determine what changes, if any, needed to be made to the pretrial order, exhibit lists, witness lists, jury charges, motions in limine, or any other trial

93

preparation efforts." Doc. 228 ¶ 30.

Premier Boiler has provided insufficient evidence to meet the high burden to show subjective bad faith. *See Purchasing Power, LLC*, 851 F.3d 1218. It cites no deposition testimony or other evidence that establishes Mr. Isbell or his counsel's faith when they acted. The court gave Premier Boiler ample time to develop such evidence, and Premier Boiler squandered its chance to do so. As the court already has explained repeatedly, "when a violation of the standing protective order came to light on the day trial was scheduled to begin, the court gave Premier Boiler its **eighth** extension and allowed limited additional discovery despite the age of this case. . . . Once again, Premier Boiler let the entire discovery period pass without taking any depositions." Doc. 191 at 9; *id.* ("Even after the court granted **seven** extensions of the discovery cutoff, Premier Boiler let the discovery deadline pass . . . despite taking no depositions." (cleaned up)); Doc. 172 at 9 ("Premier Boiler's discovery conduct during the thirty-day period is of a piece with its earlier conduct in discovery. . . . Premier Boiler has not only failed to take advantage of time for its own discovery but also thwarted IB&M's discovery.").

Premier Boiler asks this court impose an inherent-authority sanction for what could have been an inadvertent mistake, mere negligence, or simple recklessness.

94

Indeed, Mr. Isbell's counsel maintains his own good faith while acknowledging his breach. *See* Doc. 237 ¶ 8 (responding to the motion for sanctions and admitting, "While counsel should have ensured any AEO documents were first removed . . . before sending Premier's production to Isbell, this was an unintentional error . . . . It was counsel's intention to provide his client information that would assist with his defense and calculation of unpaid commissions. There was no ulterior motive. Disclosure of AEO materials to the parties was necessary for trial preparation, as all parties acknowledged when they agreed to remove the AEO designations in advance of trial."). The court will not speculate about the motives of Mr. Isbell's counsel, nor will it make a finding of bad faith without the requisite evidence.

Premier Boiler argues that "[t]he failure to implement basic safeguards to prevent disclosure of confidential materials demonstrates, at a minimum, reckless disregard for court orders." Doc. 244 at 5–6. But "recklessness alone does not constitute conduct tantamount to bad faith." *See Purchasing Power, LLC*, 851 F.3d at 1223.

Similarly, Premier Boiler asks the court to sanction Mr. Isbell based on speculation as to his motives when he shared a small subset of documents with IB&M. This does not meet the demanding standard requiring clear and convincing

evidence of subjective bad faith. Premier Boiler wasted any chance of proving Mr. Isbell's bad faith when it failed to take a single deposition during the thirty-day discovery period provided by the court for that very purpose. *See* Doc. 191 at 9.

Premier Boiler's evidentiary deficits on these issues are self-imposed. As the court explained previously, it is no stranger to Premier Boiler's pattern of "repeatedly missed deadlines, only to then come before the court claiming that the defendants engaged in rank gamesmanship[,] sharp practice, and dilatory tactics." Doc. 191 at 10 (cleaned up). "Although Premier Boiler asserts that it took much cajoling to get agreed-upon disclosures from Mr. Isbell and alleges that the defendants deprived Premier Boiler of the benefit of an entire week to draft discovery, . . . the record tells a different story about the parties' efforts to steward the thirty additional days they had in September 2025." Doc. 172 at 7 (cleaned up).

Accordingly, the court **DENIES** Premier Boiler's motion for sanctions.

### D. IB&M's Motion for Fees for Discovery Motions

As explained above, after the court continued the trial to allow discovery about the protective order breach, IB&M served written discovery requests on Premier Boiler on September 15, 2025. Doc. 164 at 2. As of October 13, 2025, the thirty-day deadline for discovery had passed, and IB&M had "no response to [its]

discovery requests . . . from Premier Boiler," *id.* n.2, so IB&M filed a motion to compel, Doc. 164.

IB&M explained that it filed the motion to compel in response to "Premier's unequivocal position in writing that it was not required to respond to *any* discovery requests from IB&M." Doc. 169 at 2. In correspondence between counsel, Premier Boiler described IB&M's requests as "impermissibly propounded" and "inappropriate bordering on obstructionist." Doc. 164 at 2. Premier Boiler demanded that IB&M "strike their written discovery requests propounded on Premier" and threatened that "any attempts to interrupt the pace or progress of [Premier Boiler's] investigation with efforts to depose Premier or any of its employees will be immediately brought to the Court's attention." *Id.* Thus, IB&M's motion to compel was apparently prompted by its belief that Premier Boiler had no intention of responding to the discovery requests, no matter the deadline. *Id.* at 2, 5.

The court explained in its October 28, 2025, order on the motion to compel that its "review of Premier Boiler's 'responses' to IB&M's discovery requests confirms that Premier Boiler acted on that intention." Doc. 172 at 4. The court explained that "[i]t strains credulity to characterize what Premier Boiler gave IB&M as 'answers' to IB&M's requests." *Id.* Premier Boiler's answers reflected twelve

97

boilerplate, shotgun-style "General Objections," which were each specifically incorporated into every answer. *See* Doc. 167-1. Along with the general objections, Premier Boiler included in each answer a specific objection that the corresponding request "seeks information that is outside of the scope of the Court's order regarding limited discovery on the issue of the breach of the protective order." *See id.*

The court detailed Premier Boiler's conduct throughout the litigation, explaining that "Premier Boiler's discovery conduct during the thirty-day period is of a piece with its earlier conduct in discovery" and that Premier Boiler's conduct "trouble[d] the court." Doc. 172 at 9–10. The court explained that "[w]hile Premier Boiler may not have diligently stewarded the thirty-day discovery period, that does not entitle Premier Boiler to refuse to substantively answer IB&M's discovery requests." *Id.* So the court ordered Premier Boiler to "substantively answer IB&M's interrogatories and requests for production" within seven days and warned Premier Boiler that the court would "not tolerate further refusal to answer." *Id.* at 10. Further, the court warned Premier Boiler that "boilerplate, shotgun-style objections . . . unaccompanied by any substantive response" would not suffice. *Id.* at 5–6.

On November 12, 2025, IB&M moved for sanctions. Doc. 193. IB&M explained that "[o]n the evening of the court-ordered deadline . . . counsel for

98

Premier Boiler emailed Premier Boiler's Answers to IB&M's [discovery requests]." *Id.* at 2. But Premier Boiler failed to fully comply with the court's order to give substantive, proper answers. *See, e.g.*, Doc. 193-3 at 8 ("[P]lease describe the facts on which Plaintiff bases its contention that Plaintiff had a legal right to engage in General Contracting Work Prior to October 1, 2024." "**ANSWER**: Objection. See General Objections, and without waiving any objections, see any applicable statute or case law reference."); *id.* ("If Plaintiff's answer to Interrogatory 14 is affirmative, please describe the facts on which Plaintiff bases its contention." "**ANSWER**: See response to Interrogatory 13," which said "see any applicable statute or case law reference"); *id.* at 6 ("[P]lease identify each customer to which Plaintiff submitted a bid, each customer with whom it entered into any contract to perform such work, and each customer for which it performed any such work." "**ANSWER**: "Objection. See General Objections, and without waiving any objections, see documents produced in response to this defendant's request for production served on the plaintiff."); Doc. 193-4 at 4–6 (responding to IB&M's requests for production with "Objection. See General Objections, and without waiving any objections, see attached").

IB&M argued that Premier Boiler's "continued recalcitrance not only

undermines the integrity of discovery but also flouts this Court's direct order." Doc. 193 at 12. "Premier Boiler was warned by this Court and proceeded at its own peril when it again refused to fully comply with its discovery obligations—this time in the shadow of an impending jury trial." *Id.* at 13. So "IB&M request[ed] that the Court find Premier Boiler in contempt of court, award IB&M its reasonable attorneys' fees and costs arising from the protraction of this litigation from September 8, 2025, and impose such additional sanctions that the Court deems to be appropriate under Rule 37(b)(2)(A)(1)-(7) and Rule 37(b)(2)(C)." *Id.*

So the court set a contempt hearing for November 14, 2025. Doc. 195. Shortly before the hearing was set to begin, IB&M notified the court that Premier Boiler "ha[d] provided substantive answers to IB&M's interrogatories and has identified documents by bates number in its Response to IB&M's request for production." Doc. 196 at 1. IB&M explained that though the contempt hearing may no longer be necessary, "IB&M does not intend to waive its claim for mandatory attorney's fees and expenses under *Fed. R. Civ. P. 37(b)(2)(C)* or such other relief under *Fed. R. Civ. P. 37(b)(2)(A)* that the Court may deem equitable and just." *Id.* at 1–2.

Federal Rule of Civil Procedure 37(b)(2)(A) says that "[i]f a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit

100

discovery, including an order under Rule . . . 37(a) [compelling disclosure or discovery], the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). But "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

IB&M has not provided the court a specific record of the reasonable fees to which it claims entitlement specifically under this rule. And in any event, as explained below, IB&M is entitled to its fees and costs from this action because the jury found Premier Boiler brought this claim in bad faith. So granting IB&M's motion for the fees and costs associated with bringing the motion to compel would result in double recovery. Accordingly, the court **DENIES** IB&M's motion for fees as sanctions.

### E. IB&M's Motion for Attorney's Fees and Costs

"In an ordinary diversity case, awards of attorney's fees are governed by applicable state law." *Perkins State Bank v. Connolly*, 632 F.2d 1306, 1310 (5th Cir. 1980). "It is clear that statutes allowing for recovery of attorney's fees are substantive for *Erie* purposes." *McMahan v. Toto*, 256 F.3d 1120, 1132 (11th Cir.

101

2001), *amended on reh'g*, 311 F.3d 1077 (11th Cir. 2002). And "the criteria to be considered by the trial court in determining a reasonable attorney fee in Alabama are set forth in *Peebles v. Miley,* 439 So. 2d 137 (Ala. 1983)." *Van Schaack*, 530 So. 2d at 749. The complete list of criteria used in the estimation of the value of an attorney's services now includes the following:

> (1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.

*Id.*

### 1. Time Consumed

*First*, the court considers the time consumed. "[I]t is generally recognized that the first yardstick that is used by the trial judges is the time consumed." *Peebles*, 439 So. 2d at 141. IB&M claims a total of 817.6 attorney and paralegal hours spent on this case. *See* Doc. 224 ¶ 5; *see* IB&M Attorney Time Records Filed Under Seal. These records are attached to this order as Exhibit 1 and Exhibit 2.

102

Premier Boiler contends that the court should significantly reduce IB&M's requested fees based on reductions selected and applied by Premier Boiler. *See* Doc. 235 at 11–13; Doc. 235-1. Premier Boiler argues that such reductions are appropriate because there are several problems with IB&M's time submission—the "fees include multiple entries that are vague, utilize block billing, have multiple attorneys performing the same tasks without any clear delineation of responsibilities, include billing for clerical tasks, and many of the tasks relate to the recovery for IB&M's counterclaim." Doc. 235 at 7. As an initial matter, IB&M did not bring a counterclaim in this case. *See* Doc. 32. The court will address the remaining objections in turn.

### a.  Block Billing and Vague Entries

Premier Boiler contends that "[t]hese vague entries, as well as those block-billed entries do not provide enough detail" for the court to evaluate IB&M's requested fees. *See* Doc. 235 at 7. As Premier Boiler acknowledges, "'[b]lock billing' occurs when an attorney lists all the day's tasks on a case in a single entry, without separately identifying the time spent on each task." *Ceres Env't Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203 (11th Cir. 2012); *see* Doc. 235 at 7. At least one district court has held that "[w]hen attorneys include

103

multiple tasks in a single time entry, courts cannot determine the amount of time spent on particular tasks." *Kearney v. Auto-Owners Ins. Co.*, 713 F. Supp. 2d 1369, 1377–78 (M.D. Fla. 2010).

"[T]he mere fact that an attorney includes more than one task in a single billing entry is not, in itself, evidence of block-billing." *Grayson v. No Labels, Inc.*, No. 6:20-CV-1824-PGB-LHP, 2024 WL 473775, at *15 (M.D. Fla. Jan. 4, 2024), *report and recommendation adopted*, No. 6:20-CV-1824-PGB-LHP, 2024 WL 863117 (M.D. Fla. Feb. 29, 2024), *aff'd*, No. 24-10777, 2025 WL 100788 (11th Cir. Jan. 15, 2025), *cert. denied*, 146 S. Ct. 358, 223 L. Ed. 2d 190 (2025) (cleaned up). "When the tasks are intertwined, a thorough description of the activities clarifies, rather than obscures, the record." *Id.* (cleaned up).

Premier Boiler objects to a substantial portion of IB&M's entries on the grounds that the entries are block-billed and vague. *See* Doc. 235-1.

Many of the entries challenged by Premier Boiler are not improper block billing. *See, e.g.*, Doc. 235-1 at 3 ("Work related to review of Premier's motion to Amend and review of relevant cases to oppose motion."), 5 ("Work related to review of communications from opposing counsel concerning Rule 26 report; phone conference with Mr. Paulk and Mr. Stephens concerning the same."), 7 ("Emails

104

to/from attorneys regarding revisions to Scheduling Order and Joint Motion To Extend Times; receipt of draft of Motion and revisions."), 8 ("Work related to final review of client's discovery responses and compilation for production to Premier's counsel; email to Premier's counsel."), 17 ("Preparation of Motion for Summary Judgment and legal brief in support thereof; review of AL law to support defenses to each claim made by Premier; drafting of statement of undisputed material facts.").

But some of IB&M's multi-task entries do combine various unrelated tasks. *See, e.g.*, Doc. 235-1 at 12 ("Emails to/from co-counsel and Premier's attorney regarding expert witness disclosures and extension of time; receipt of draft of motion for extension of time; emails to/from D. Schaffer and expert witness; conference call D. Schaffer and expert witness and review of select discovery documents; phone conference and emails to and from Paul's attorney."), 19 ("Work related to drafting of response to Premier's omnibus motion to strike IB&M and Isbell's Motions for Summary Judgment. Review of law for citation in response concerning Rule 56(d) and absence of good cause when the litigant fails to take advantage of time granted for discovery prior to discovery deadline. Teams meeting with Gerald Paulk to discuss my findings and revisions to Joint Response to Premier's Motion."), 20 ("Prepare for and attend ZOOM conference call with Client and attorney team;

105

receipt of new documents from Premier attorneys; follow up conference call with D. Schaffer; review and download Secretary of State corporate filings; emails to/from H. Stephens and D. Schaffer."), 21 ("Receipt and review Isbel[l]'s responses to Premier's Motions in Limine; review motions related to IB&M evidence; email to D. Shaffer and work on responses to motions.").

In such a situation, the Eleventh Circuit "approved the opponent's solution of dividing each day's hours by the number of tasks listed and assigning the quotient to each task." *Ceres Env't Servs., Inc.*, 476 F. App'x at 203. "Courts have also approved across-the-board reductions in block-billed hours to offset the effects of block billing." *Id.*

But such an across-the-board reduction is not warranted here, though Premier Boiler asks the court to reduce each block-billed entry by 20%, with a further 30% reduction for "vague" entries. *See* Doc. 235 at 12; Doc. 235-1. IB&M did not "routinely include[] half a dozen or more separate tasks" or "pepper[] [the entries] with vague language such as 'working with John Doe,' and the even more unhelpful (and somewhat unsettling) entry, 'continuing work on case.'" *See Ceres Env't Servs., Inc.*, 476 F. Appx. at 203 (cleaned up) (criticizing such billing). Rather, the time entries are sufficiently specific (and the block-billed entries sufficiently limited

106

and rare) that if the court does the Circuit-approved approach of dividing the hours by the number of tasks, the court can determine reasonableness for each task. And when it does so, the court determines that the hours spent are reasonable. The block-billed entries that contain noncompensable tasks will be reduced accordingly.

### b. Clerical Tasks

Premier Boiler also claims that "[a]dditional entries involve clerical tasks, which are not compensable." Doc. 235 at 8.

Because paralegals often perform work "that might otherwise be performed by a lawyer and billed at a higher rate," such as "factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence," a court may compensate a successful litigant for time spent by them if the prevailing practice in the local community is to separately bill for their work. *Missouri v. Jenkins*, 491 U.S. 274, 288 & n.10 (1989). But the Eleventh Circuit has iterated that the efforts of a paralegal are recoverable "only to the extent that the paralegal performs work traditionally done by an attorney." *Jean v. Nelson,* 863 F.2d 759, 778 (11th Cir. 1988) (cleaned up). Where that is not the case, paralegal work is viewed as falling within the category of

107

unrecoverable overhead expenses. *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 697 (5th Cir. 1982). Similarly, work by "secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product" is usually subsumed in the rates already charged by attorneys. *Jenkins*, 491 U.S. at 285; *accord Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 580–83 (2008). If work is "purely clerical or secretarial," it should not be billed at paralegal or attorney rates, even if a paralegal or attorney performs it. *Jenkins*, 491 U.S. at 288 n.10.

Premier Boiler objects to more than thirty of IB&M's entries as clerical. *See* Doc. 235-1. The court agrees that certain entries bill for "attorney[s] undert[aking] tasks which were mundane, clerical or which did not require the full exercise of an attorney's education and judgment" and thus should be removed from the fee award. *See Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1306 (11th Cir. 1988). "Where such an adjustment is made the district court must provide an identification of the hours falling within this category . . . ." *Id.* Accordingly, the court deducts the following entries and corresponding fees from the award, with an appropriate adjustment for the entry that is block-billed:

| Task | Fee |
|------|-----|
| Work related to creating pleading index and binder for case file. | $112.50 |

108

| | |
|---|---|
| Emails to/from Co-counsel and Premier attorneys tying down details of time place and order of mediation. | $150.00 |
| Receipt and review Order setting pretrial conference Pretrial order and setting deadlines for additional filings; diary time limits and deadlines. | $90.00 |
| Service of Request for Admissions on counsel for Premier. | $150.00 |
| Review email from Alabama co-counsel; drafting of responsive email concerning potential deposition dates; drafting of email reminder to Randy and Taylor. | $120.00 |
| Telephone call to Alabama Licensing Board; draft correspondence forwarding check for copies; prepare FedEx; send. | $39.00 |
| Compilation of materials for bench copy of motion for summary judgment; drafting of table of contents, and hardcopy binder of motion for summary judgment materials for bench copy to Judge Manasco. | $300.00 |
| Communications with co-counsel and IB&M concerning organization of all hands meeting for trial; preparation of agenda based on witness and exhibit lists. | $210.00 |
| Prepare for and attend ZOOM conference call with Client and attorney team; receipt of new documents from Premier attorneys; | ~~$900~~ |

| | |
|---|---|
| follow up conference call with D. Schaffer; review and download Secretary of State corporate filings; emails to/from H. Stephens and D. Schaffer.[4] | $360.00 |
| Work related to trial preparation including resolution of administrative matters concerning exhibits. | $450.00 |
| Work related to assisting DJS with trial preparation including printing and organizing key filings. | $260.00 |
| Continued work related to trial preparation to assist DJS with compilation and organization of exhibits. | $390.00 |
| Work related to assisting DJS with trial preparation including review of trial list and gathering of final items that need to be taken to Alabama for trial. | $104.00 |
| Continued work related to trial preparation; updating of trial binders for DJS. | $65.00 |
| Continued work related to trial preparation for DJS and finishing binders of documents DJS needs for trial. | $130.00 |

---

[4] This entry contains two clerical tasks grouped with three non-clerical tasks. So instead of deducting the full amount, the court will "divid[e] [the] day's hours by the number of tasks listed and assign[] the quotient to each task." *See Ceres Env't Servs., Inc.*, 476 F. App'x at 203. The court will then multiply that quotient—0.6—by the hourly rate for this attorney—$300—and deduct $360 from the from the fees to be awarded to account for the two clerical tasks.

| | |
|---|---|
| Work related to preparing new exhibit binder. | $260.00 |

### c. Travel Time

Premier Boiler contends that "the Eleventh Circuit specifically precludes shifting the expense of hiring out-of-town counsel on an adversary 'unless it was unreasonable not to hire qualified local counsel.'" Doc. 235 at 6 n.2 (purporting to quote *Johnson v. Univ. Coll. of Univ. of Alabama in Birmingham*, 706 F.2d 1205 (11th Cir. 1983), *holding modified by Gaines v. Dougherty Cnty. Bd. of Educ.*, 775 F.2d 1565 (11th Cir. 1985)).

"[A]lthough there are no precise rules with respect to travel time, a fee applicant seeking to recover expenses incurred for retaining non-local counsel generally must show a lack of attorneys practicing in that place who are willing and able to handle his claims." *Martinez v. Hernando Cnty. Sheriff's Off.*, 579 F. App'x 710, 714 (11th Cir. 2014) (cleaned up). But "the exclusion of out-of-town counsel's travel time is proper only if it was unreasonable not to hire qualified local counsel." *Johnson*, 706 F.2d at 1208. But even if it is not "reasonable to award non-local attorneys' rates when competent local counsel were willing and able to handle the fee-applicant's claims," the Eleventh Circuit explicitly did "not rule out the possibility that there might be a case where use of an attorney from a higher-rate

111

market who had extensive prior experience with a particular factual situation could be justified because of efficiencies resulting from that prior experience." *Am. C.L. Union of Georgia v. Barnes*, 168 F.3d 423, 437–38 (11th Cir. 1999). "That could be reasonable and cost-sensible, especially if it resulted in lower costs than would otherwise be necessary." *Id.* at 438. That is the case here.

IB&M reasonably relied on its general counsel—who "represents and has represented IB&M in [related] Tennessee litigation with Premier for a number of years," *see* Doc. 243 ¶ 11—rather than local counsel that would have to learn this litigation anew. And IB&M's attorney affidavit explains that Gerald Paulk (one of IB&M's two attorneys) billed at a rate "much lower than the rate charged by his peers in the Birmingham, Alabama market." Doc. 224-1 ¶ 4. And Darald Schaffer (the other of IB&M's two attorneys) similarly billed at a rate that is "consistent (and perhaps lower) than the hourly rates charged by lawyers in the Birmingham, Alabama area with his level of experience and expertise." *Id.* Based on this court's experience and expertise, it agrees. Accordingly, even though IB&M hired non-local counsel, such decision avoided the likely expense of hiring more expensive local counsel that was entirely unacquainted with IB&M generally and this case specifically. Accordingly, the court declines to deduct travel time.

112

### d. Multiple Attorneys Billing for a Task

Finally, Premier Boiler claims that "[t]he time entries also include time spent by multiple attorneys performing what appears to be the same tasks, with no clear delineation of roles or tasks performed." Doc. 235 at 8. And Premier Boiler argues that IB&M improperly included "instances where inter-office conferences were billed, which is typically not recoverable." *Id.* But the case Premier Boiler cites describes instances where such inter-office meetings constituted "a sizable portion of the total hours billed" or constituted "incessant conferring," particularly where counsel over-staffs a case so "the need for internal conferences to keep everyone on the same recipe rises dramatically and undermines the reasonableness of those billings." *Lee v. Krystal Co.*, 918 F. Supp. 2d 1261, 1269–70 (S.D. Ala. 2013) (cleaned up); *see* Doc. 235 at 8.

Here, the court finds nothing "duplicative, redundant, or otherwise unreasonable" about the attorney conferences reflected in IB&M's counsel's records. *See Lee*, 918 F. Supp. 2d at 1270. Because Premier Boiler sued Mr. Isbell and IB&M—whose litigation interests were often inextricably intertwined—frequent communication among defense counsel was necessary.

Premier Boiler claims that "[t]here are numerous instances where four and as

113

many as six billers entered time for the same event, all without a clear delineation of roles and jobs performed." Doc. 235 at 9. The court finds nothing unreasonable about Mr. Schaffer and Mr. Paulk working with a legal assistant and paralegal to defend IB&M against a seven-figure damages demand that stretched more than three years. And to the extent Premier Boiler objects to IB&M and Mr. Isbell's counsel both participating in the litigation, it is because Premier Boiler chose to sue two parties whose interests were often—but not invariably—intertwined that two defense teams were necessary.

"[A] reduction for redundant hours is warranted only if the attorneys are unreasonably doing the same work." *Am. C.L. Union of Georgia*, 168 F.3d at 432 (cleaned up). "An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.* (cleaned up). "Thus, a fee applicant is entitled to recover for the hours of multiple attorneys if he satisfies his burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation." *Id.* "But the fee applicant has the burden of showing that, and where there is an objection raising the point, it is not a make-believe burden." *Id.* After giving detailed

114

consideration to the work performed by each attorney and carefully balancing their respective contributions, the court finds no unreasonable duplication among efforts.

Nor is it appropriate to "[c]ut[] completely" an attorney's hours during the trial simply because another attorney was also present. *See* Doc. 235-1 at 29. Premier Boiler asks the court to cut (or otherwise subtract) hours from various entries by Mr. Schaffer and Mr. Paulk because "No particular role or process at trial." *See id.* For example, Premier Boiler asks the court to "[c]ut[] completely" Mr. Paulk's entry that says "Trial Phase II of case; jury deliberations and verdict; travel Birmingham to Scottsboro" because "No particular role or process at trial." *Id.* But the court is satisfied that Mr. Paulk and Mr. Schaffer both played important and distinct roles at the trial. *See, e.g.*, Day 4 Tr. at 118 (giving the closing argument for Phase 1); Day 5 Tr. at 144 (giving the rebuttal for Phase 2); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1188 (11th Cir. 1983) ("All attorneys who contribute their services to a case may be awarded reasonable attorneys' fees."). Accordingly, the court declines to entirely cut the entries on the basis that they improperly billed for more than one attorney doing the same task.

Premier Boiler also objects to one entry as "Not Related to this case. Cut Completely." *See* Doc. 235-1 at 27. But Premier Boiler provides no basis for this

115

assertion. *See id.* The time entry states, "Phone call with Scott Smith to discuss discovery matters." *Id.* The court has no reason to believe that a phone call with co-counsel in this case is "Not Related to this case." Accordingly, the court declines to cut the entry.

### 2. Attorney's Professional Experience and Reputation and the Learning, Skill, and Labor Requisite to the Representation's Proper Discharge

*Second* and *third*, the court considers together the professional experience and reputation of the attorney and the learning, skill, and labor requisite to the representation's proper discharge. *See Peebles*, 439 So. 2d at 143 (considering these factors together).

IB&M provides an affidavit from an attorney familiar with Mr. Paulk and Mr. Schaffer's expertise and experience. *See* Doc. 224-1. The attorney explains that Mr. Paulk "has practiced law for 46 years and is highly regarded by his peers." *Id.* ¶ 3. The attorney also describes that Mr. Paulk "has decades of experience in commercial litigation and serves as general counsel for banks and other businesses." *Id.* He similarly explains that "Mr. Schaffer has been practicing law for 15 years and . . . is highly regarded by his peers in the legal profession." *Id.* Premier Boiler does not challenge the professional experience and reputation of these attorneys. *See* Doc.

116

235 at 10.

### 3.  Nature and Value of the Subject Matter of Employment and the Weight of the Attorneys' Responsibilities

*Fourth* and *fifth*, the court considers together the nature and value of the subject matter of employment and the weight of the attorneys' responsibilities. *See Peebles*, 439 So. 2d at 143 (explaining these factors together). "Although an attorney must treat all cases with seriousness and discharge his responsibilities to the best of his ability, common sense tells us that some cases are more complex, involve the lives and fortunes of larger numbers of people, and have a greater public value than other cases." *Id.* "In such cases, due consideration must be made in adjusting the attorney's fee." *Id.*

The attorney affidavit submitted by IB&M claims that "[t]he issues involved in [this case] were technical and required a specialized skillset and a high level of litigation experience to effectively represent IB&M." Doc. 224-1 ¶ 6. And "the stakes were high in this case in that the plaintiff was seeking damages in excess of $1,000,000.00, as well as an award of attorneys' fees." *Id.* IB&M's counsel claims that "a failure to successfully defend IB&M would have been devastating to IB&M's business." Doc. 243 ¶ 6. Premier Boiler contends that the nature and value of the case is neutral, but Premier Boiler does not challenge the weight of the

117

responsibilities. *See* Doc. 235 at 9–10.

### 4. Measure of Success Achieved

*Sixth*, the court considers the measure of success achieved. IB&M's counsel obtained a jury verdict in IB&M's favor on Premier Boiler's claim as well as a verdict that Premier Boiler brought the claim in bad faith. Docs. 211, 212. "This is the best result that could have been obtained at trial for IB&M." Doc. 224-1 ¶ 7.

### 5. Reasonable Expenses Incurred

*Seventh*, the court considers the reasonable expenses incurred. IB&M lists $97,614.78 in expenses and costs. Ex. 1 at 23; Ex. 2 at 19. As explained below, IB&M may not recover the fees incurred as expert witness fees, but upon consideration, the court finds reasonable IB&M's claimed expenses. *See id.*

### 6. Fixed or Contingent Fee

*Eighth*, the court considers whether a fee is fixed or contingent. "[Alabama] cases recognize that an attorney on a contingent fee basis is entitled to charge more than an attorney who is guaranteed compensation by periodic billings." *Peebles*, 439 So. 2d at 142. IB&M's counsel has provided no evidence that this fee was contingent, and the court has no reason to believe that it is. *See* Doc. 243 ¶ 14 (stating that this factor does not apply). Accordingly, this factor is due no weight.

### 7. Nature and Length of the Professional Relationship and

118

### Likelihood that Particular Employment May Preclude Other Employment

*Ninth* and *tenth*, the court considers together the nature and length of the professional relationship and likelihood that a particular employment may preclude other employment. *See Peebles*, 439 So. 2d at 143 (explaining these factors together). "Under appropriate circumstances, an attorney who is the attorney for a client who has frequent and continuing legal problems may make appropriate adjustment of the amount of the fee charged. What would be a reasonable fee to such a client may not be the same as for a client who sees the lawyer for the first time." *Id.* "The converse of this treatment of the longstanding client is the treatment of a client whose case may preclude other substantial employment." *Id.* "Because of this potential loss of clients, a lawyer in setting a reasonable attorney's fee may take this into consideration." *Id.*

Mr. Schaffer represents that he has a "long-standing attorney-client relationship as general counsel for IB&M including, but not limited to, his representation of IB&M in its pre-existing Tennessee lawsuit against Premier and Mr. Davies." Doc. 243 ¶ 11. Mr. Schaffer explains that he "has represented IB&M in the Tennessee litigation with Premier for a number of years." *Id.* Mr. Paulk is "the sponsoring attorney for [Mr. Schaffer] . . . under his *pro h*[*a*]*c vice* admission by the

119

Court in this case." Doc. 226-1 ¶ 5.

This longstanding relationship counsels that the fees IB&M was willing to pay Mr. Schaffer are reasonable. IB&M's counsel presented no evidence indicating that they were precluded from other employment by representing IB&M in this action. *See* Doc. 243 ¶ 14 (stating that this factor is not implicated).

### 8. Fee Customarily Charged in the Locality for Similar Services

*Eleventh*, the court considers the fee customarily charged in the locality for similar legal services. IB&M's counsel submitted an affidavit from an attorney "familiar with the prevailing hourly rates for attorneys practicing in the Birmingham, Jefferson County, Alabama area that have comparable experience and knowledge to that of Gerald Paulk and Darald Schaffer." *See* Doc. 224-1 ¶ 2. Attorney Turner B. Williams states that the $300 hourly rate charged by both of IB&M's attorneys was "consistent (and perhaps lower) than the hourly rates charged by lawyers in the Birmingham, Alabama area" with comparable levels of experience. *See id.* ¶ 4. Premier Boiler concedes that these rates are reasonable. *See* Doc. 235 at 1 ("Premier . . . does not challenge the reasonableness of the rates charged by counsel for IB&M . . . ."), 11 ("Premier does not challenge this factor."). Premier Boiler's concession appears to include IB&M's explanation that a retired partner, billing at $400 per

120

hour, worked for two hours on the case, a paralegal working on the case billed at $130 an hour, and a legal assistant working on the case billed at $75 an hour. *See* Doc. 226-2 ¶ 5. Accordingly, the court finds these rates reasonable. *See Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994).

### 9. Time Limitations Imposed by the Client or Circumstances

*Twelfth*, and finally, the court considers the time limitations imposed by the client or by the circumstances. This factor includes considering whether the "lawyer was precluded from other business by virtue of the fact that he had to proceed with great haste to obtain for the plaintiff the obligation that was due [him]." *Peebles*, 439 So. 2d at 143. IB&M has presented no evidence that its counsel was under any time limitations or that other difficult circumstances existed in their representation of IB&M, and the court cannot readily discern any such circumstances. *See* Doc. 243 ¶ 14 (stating that this factor is not implicated). Accordingly, this factor is due no weight.

### 10. Expenses and Costs

IB&M requests $97,614.78 in expenses and costs. *See* Ex. 1 at 23; Ex. 2 at 19. Premier Boiler contends that IB&M cannot recover any of these expenses or costs because "[t]he ATSA does not authorize an award of litigation expenses or costs,

121

only attorney's fees." Doc. 235 at 5. According to Premier Boiler, "[c]osts and expenses are different . . . from attorney's fees" and the ATSA "provides an award of attorney's fees" but not "an award of litigation expenses or costs." *Id.*; *see* Ala. Code § 8-27-4(a)(2) ("Reasonable attorney's fees to the prevailing party if . . . [a] claim of actual or threatened misappropriation is made or resisted in bad faith.").

While expenses and costs may not be recoverable under the ATSA, certain expenses and costs are recoverable under Federal Rule of Civil Procedure 54(d). *See* Doc. 224 at 1 (invoking Rule 54(d)). Rule 54 provides, "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees— should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1).

IB&M seeks $92,440.30 in expert witness fees and $5,174.48 in other expenses and costs. *See* Ex. 1 at 23; Ex. 2 at 19. The Supreme Court has explained that "§ 1920 defines the term 'costs' as used in Rule 54(d)." *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987); 28 U.S.C. § 1920 ("A judge or clerk of any court of the United States may tax as costs . . . . [f]ees and disbursements for printing and witnesses."). And "[o]ne of the items enumerated in § 1920 is the witness fee, set by § 1821(b) at $[4]0 per day." *Crawford Fitting Co.*, 482 U.S. at 442; *see* 28 U.S.C. § 1821(a)–(b). So "when a prevailing party seeks reimbursement

122

for fees paid to its own expert witnesses, a federal court is bound by the limit of § 1821(b), absent contract or explicit statutory authority to the contrary." *Crawford Fitting Co.*, 482 U.S. at 439. "[A] federal court may tax expert witness fees in excess of the $[4]0–per-day limit set out in § 1821(b) only when the witness is court-appointed." *Id.* at 442. That is not the case here. And IB&M has cited nothing to suggest that the ATSA alters this limit. *See Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 340, (2019) ("A statute awarding 'costs' will not be construed as authorizing an award of litigation expenses beyond the six categories listed in §§ 1821 and 1920, absent an explicit statutory instruction to that effect."); *Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1289 (11th Cir. 1983) ("[I]t is well settled that expert witness fees cannot be assessed in excess of witness fees provided in § 1821."). And IB&M's expense log is not documented in such a way that the court can discern whether and when the expert witness fees were incurred for attendance at a deposition or court sitting. *See* Ex. 1 at 23; *see e.g., Kivi*, 695 F.2d at 1289 ("additional amounts paid as compensation, or fees, to expert witnesses cannot be allowed or taxed as costs in federal courts" (cleaned up)). Accordingly, the expert witness expenses are unrecoverable.

Premier Boiler contends that the remaining non-expert-witness expenses and

costs "are still excessive and inappropriate under Alabama law." Doc. 235 at 6. Premier Boiler primarily objects to the "expense [IB&M] incurred by hiring out-of-town counsel . . . , especially when considering the volume of attorneys located within this district." *Id.* But, as explained above, such expense is proper here. *See Dowdell*, 698 F.2d at 1192 ("Travel, telephone, and postage expenses are not unusual. All of them have been awarded in the decisions of the courts of this circuit."); *Oden v. Vilsack*, No. 10-00212-KDM, 2013 WL 4046456, at *19, *20 (S.D. Ala. Aug. 9, 2013) (awarding expenses for lodging and meals); *Cromer-Tyler v. Teitel*, No. 1:01-cv-1077-MEF-SRW, 2007 WL 2684878, at *6 (M.D. Ala. Sept. 11, 2007) (awarding expenses for attorney mileage and meals).

Accordingly, IB&M is entitled to $5,174.48 of costs and expenses incurred not as expert witness fees and $234,904 in attorney's fees. The court **GRANTS IN PART** and **DENIES IN PART** IB&M's motion to award attorney's fees and costs. Doc. 224.

### 11. Fees Incurred in Litigating Post-Verdict Motions

On May 29, 2026, IB&M supplemented its petition to include fees incurred in litigating the post-verdict motions. Doc. 246. These time records are attached to this order as Exhibit 3 and Exhibit 4.

"The law seeks to compensate attorneys for work reasonably done actually to secure for clients the benefits to which they are entitled." *Norman*, 836 F.2d at 1305. "[C]ounsel are entitled to compensation until all benefits obtained by the litigation are in hand. Hence, hours reasonably expended on post-[verdict] administration are compensable." *Id.*; *Johnson v. Mississippi*, 606 F.2d 635, 638 (5th Cir. 1979) ("We conclude that attorney's fees may be awarded for time spent litigating the fee claim.").

The court has carefully reviewed IB&M's supplemental fee petition. For the same reasons explained above, the court finds that IB&M's supplemental fees are reasonable. Premier Boiler's various objections are unavailing. *See* Doc. 248. Accordingly, IB&M is also entitled to $14,370 for the attorney's fees incurred in litigating the post-verdict motions. *See* Ex. 3; Ex. 4.

### F. Mr. Isbell's Motion for Fees and Costs

As explained above, the court will consider the *Peebles* factors in determining Mr. Isbell's reasonable attorney's fees.

#### 1. Time Consumed

*First*, the court considers the time consumed. Mr. Isbell claims a total of 1,845.95 attorney and paralegal hours spent on this case. *See* Doc. 223 ¶ 5; *see* Isbell

125

Attorney Time Records Filed Under Seal. These records are referenced in this order and filed with the Clerk of Court as Exhibit 5.

Premier Boiler argues that there are several problems with Mr. Isbell's time submission—the "fees include multiple entries that are vague, utilize block billing, have multiple attorneys performing the same tasks without any clear delineation of responsibilities, include billing for clerical tasks, and many of the tasks relate to the recovery for Isbell's counterclaim." Doc. 234 at 8. The court will address the remaining objections in turn.

### a. Block Billing and Vague Entries

Premier Boiler contends that Mr. Isbell's records contain "vague entries, as well as those block-billed entries[, which] do not provide enough detail" for the court to evaluate Mr. Isbell's requested fees. *See id.*; Doc. 234-1.

Many of Mr. Isbell's counsel's entries are textbook block-billing. *See, e.g.*, Doc. 234-1 at 16, 17, 18, 19, 27, 28.

Although the court was able to parse through IB&M's occasional, limited multi-task billing to apply a simple mathematical formula, Mr. Isbell's counsel regularly used block billing to account for entire days, and its fee submission comprises over 900 lines. *See* Ex. 5. The Supreme Court has explained that "the fee

126

applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates," and "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

"The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). "So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.*

The court has conducted an extensive review of Mr. Isbell's attorney's billing records. Premier Boiler asked the court to deduct 20% of each entry that was blockbilled. Doc. 234 at 13; Doc. 234-1. Premier Boiler similarly asks for a 30% reduction in entries that it identifies as "vague." Doc. 234 at 13; *see* Doc. 234-1. While the court does not agree that the entries are impermissibly vague, the court agrees that an across-the-board reduction is appropriate to account for the extensive use of block-billing. Accordingly, the court deducts 20% from the final fee award, after removing the deductions explained below. *See Ceres Env't Servs., Inc.*, 476 F. App'x at 203–04; *Grayson*, 2024 WL 473775, at *16–17 (collecting cases and recommending a 50% reduction in hours).

127

### b. Clerical Tasks

Premier Boiler also claims that Mr. Isbell's counsel's "entries involve clerical tasks, which are not compensable." Doc. 234 at 9.

Some entries by Mr. Isbell's counsel bill for "attorney[s] undert[aking] tasks which were mundane, clerical or which did not require the full exercise of an attorney's education and judgment" so those are removed from the fee award. Accordingly, the court deducts the following entries and corresponding fees from the award, with appropriate adjustments for entries that are block-billed:

| Task | Fee |
|---|---|
| Final proof read of motion to dismiss before filing. | $200.00 |
| Selection and discussion of dates for draft report of parties' planning meeting. | $125.00 |
| Scheduling client call. | $50.00 |
| Exchange of emails with client and scheduling meeting. | $50.00 |
| Coordinating paralegal assistance for upcoming document production in response to Plaintiff's requests for production. | $75.00 |
| Facilitating final approval and filing of joint motion for extension | |

| | |
|---|---|
| of time; exchange of emails with client re sending updated verification page. | $125.00 |
| Incorporate H.Stephens edits; circulate to co-counsel for approval; send to Plaintiff's counsel for approval; coordinate filing following approval from all parties. | $125.00 |
| Correspondence with career clerk and counsel re filing new proposed motion for extension and coordinating filing of new motion following approval of all parties. | $125.00 |
| Email client reminder regarding mailing of interrogatory verification page. | $75.00 |
| Organize and send document[]s for Defendants' expert's review. | $462.00 |
| Review Isbell's opposition to Plaintiff's motion to summarily deny defendant's motions for summary judgment, to reopen discovery and continue trial; create exhibits for the same. | $357.50 |
| Coordinate invoices produced by Premier for P.Isbell's review. | $82.50 |
| Prepare recent filings to deliver to Judge Manasco. | $110.00 |
| Prepare Isbell trial exhibits and court exhibit form. | $176.00 |
| Prepare and send word document versions of jury instructions, | $82.50 |

129

| | |
|---|---|
| verdict form, and voir[] dire questions for the court. | |
| Research, draft, and finalize status report due to Judge Manasco; review and revise notebook of key documents for District Court at pretrial related to discovery into licensing issue; research in preparation for pretrial hearing; research and outline motion to compel.[5] | ~~$2,500.00~~ $625 |
| Analyze jury instructions and pretrial order in preparation for pretrial hearing; identify and compile documents for counsel binders for pretrial hearing; identify and compile documents for discovery binder for the court.[6] | ~~$907.50~~ $605 |
| Prepare binder of discovery documents for opposing counsel; review the same in preparation for pretrial hearing; confer with S.Smith regarding pretrial hearing.[7] | ~~$550.00~~ $184.25 |

---

[5] This entry contains one clerical task grouped with three non-clerical tasks. So instead of deducting the full amount, the court will "divid[e] [the] day's hours by the number of tasks listed and assign[] the quotient to each task." *See Ceres Env't Servs., Inc.*, 476 F. App'x at 203. The court will then multiply that quotient—1.25—by this attorney's hourly rate—$500—and deduct $625 from the from the fees to be awarded to account for the clerical task.

[6] This entry contains two clerical tasks grouped with a non-clerical task. So instead of deducting the full amount, the court will "divid[e] [the] day's hours by the number of tasks listed and assign[] the quotient to each task." *See Ceres Env't Servs., Inc.*, 476 F. App'x at 203. The court will then multiply that quotient—1.1—by this attorney's hourly rate—$275—and deduct $605 from the from the fees to be awarded to account for the two clerical tasks.

[7] This entry contains one clerical task grouped with two non-clerical tasks. So instead of deducting the full amount, the court will "divid[e] [the] day's hours by the number of tasks listed and assign[] the quotient to each task." *See Ceres Env't Servs., Inc.*, 476 F. App'x at 203. The court will then multiply that quotient—0.67—by this

130

| | |
|---|---|
| Preparation of materials and exhibits for trial. | $1,700.00 |
| Continued preparation for trial, including exhibit binders, motions in limine chart, and additional materials needed. | $1,240.00 |
| Preparation of exhibits and materials for trial. | $2,960.00 |
| Pack research and briefing materials for trial; travel from Huntsville to Birmingham for trial.[8] | ~~$2,250.00~~ $1,500.00 |

### c. Travel Time

According to Premier Boiler, hiring out-of-town counsel was "improper, especially when considering that the firm Isbell hired has its headquarters roughly two blocks from this Court." Doc. 234 at 7. Premier Boiler contends that this headquarters has "many [local] lawyers more than capable of handling his defense in this action." *Id.*

Mr. Isbell contends that "Premier can hardly complain about this choice of counsel: it had 3 different Chattanooga lawyers appear for it in this case." Doc. 241

---

attorney's hourly rate—$275—and deduct $184.25 from the from the fees to be awarded to account for the clerical task.

[8] As explained below, the court deducts $750 from this entry to reflect the travel time, and the court deducts the remaining $1,500 here.

¶ 5. And Mr. Isbell speculates that "those lawyers charged their client an hourly rate for travel along with travel expenses," so Mr. Isbell wants the court to "take judicial notice that Chattanooga is further from Birmingham than Huntsville is." *Id.* Mr. Isbell further explains "had Isbell hired Birmingham attorneys, their hourly rate would likely be higher." *Id.*; *see* Doc. 223-1 ¶¶ 9–10 (affidavit of attorney stating that the rates sought by Mr. Isbell's counsel are lower than usual rates for a case of similar significance and sophistication).

The court discerns no evidentiary basis to discount the reasonable rates of Mr. Isbell's counsel, but the court will not allow them to pass travel costs onto Premier Boiler. *See Martinez*, 579 F. App'x at 714 ("We respect [a party's] right to retain counsel of his choice, but, like the district court, we do not think it reasonable to pass the costs of [that counsel's] travel on to the [opposing party] without a showing of a lack of local counsel.").

Accordingly, the court deducts the following entries and corresponding fees from the award, with appropriate adjustments for entries that are block-billed, as explained below:

| Task | Fee |
|---|---|
| Return travel from Birmingham, Alabama to Huntsville, Alabama from pre-trial hearing. | $467.50 |

132

| | |
|---|---|
| Travel from Huntsville, Alabama to Birmingham, Alabama for pre-trial hearing. | $495.00 |
| Continued and completed preparation for pretrial conference; **traveled to Birmingham** for pretrial conference before Judge A.Manasco; communicate with defense counsel in advance of hearing; attend pretrial conference; visited Judge Vance courtroom to be viewed for trial; follow-up meeting with defense counsel; **return travel to Huntsville**; telephone conference with P.Isbell regarding pretrial conference. | ~~$2,925.00~~ $1,125.00 |
| Travel to Birmingham, Alabama from Huntsville, Alabama to appear and represent P.Isbell for motion in limine hearing in the U.S. District Court for the Northern District of Alabama. | $495.00 |
| Review of motions in limine in preparation for court hearing; preparation of proposed voir dire examination; **travel to Birmingham** for court hearing; communicate with counsel regarding same. | ~~$1,612.50~~ $562.50 |
| Travel to Birmingham for pre-trial. | $900.00 |
| Return travel from Birmingham, Alabama to Huntsville, Alabama. | $495.00 |

133

| | |
|---|---|
| Attended court hearing on pending motions in limine before Judge A.Manasco; follow-up office conference with counsel regarding court hearing and case strategy; **return travel to Huntsville**; telephone conference with P.Isbell regarding court hearing. | ~~$2,175.00~~ $562.50 |
| Travel from Birmingham to Huntsville from pre-trial hearing. | $850.00 |
| Return travel from Birmingham, Alabama to Huntsville, Alabama. | $467.50 |
| Travel to Birmingham, Alabama from Huntsville, Alabama to meet with P.Isbell for trial preparation. | $412.50 |
| **Traveled to Birmingham** for trial preparation with P.Isbell; office conference with P.Isbell to review direct testimony and trial exhibit documents; telephone conference with G.Paulk regarding case status/strategy; continued and completed initial trial prep session with P.Isbell; **return travel to Huntsville**. | ~~$3,825.00~~ $1,125.00 |
| Return travel from Birmingham, Alabama to Huntsville, Alabama. | $495.00 |
| Travel from Huntsville, Alabama to Birmingham, Alabama for final pre-trial hearing and meeting with expert J.Windham. | $467.50 |

| | |
|---|---|
| **Traveled to Birmingham** for expert witness meeting and pre-trial conference; meeting with J.Windham regarding analysis of T.Wright's opinions; completed preparation for and attended pre-trial hearing; follow-up conference with defense counsel; **return travel to Huntsville**. | ~~$4,312.50~~ $1,125.00 |
| Travel to and from Birmingham for pretrial hearing before Judge Manasco. | $2,150.00 |
| Travel from Huntsville, Alabama to Birmingham, Alabama for trial technology meeting with the court and trial preparation with P.Isbell. | $467.50 |
| Return travel from Birmingham, Alabama to Huntsville, Alabama. | $495.00 |
| **Traveled to Birmingham** for client meeting and tech courtroom review; office conference with P.Isbell regarding trial preparation; showed P.Isbell courtroom and trial orientation; attended tech review with F.Sherman; continued trial testimony prep with P.Isbell; **returned to Huntsville**. | ~~$3,450.00~~ $1,125.00 |
| Travel from Huntsville, Alabama to Birmingham, Alabama for trial. | $467.50 |

| | |
|---|---|
| Continued and completed closing argument outline; review of opening statement; review of key documents; review and revision of P.Isbell direct examination; **travel to Birmingham** for meeting with client and trial; office conference with P.Isbell regarding case status, preparation for direct examination, cross-examination and trial; conference with S.Smith and E.Duke regarding trial; conference with D.Schaffer and G.Paulk regarding trial; review and revision of cross-examination of M.Davies; review of opening statement. | ~~$3,187.50~~ $562.50 |
| Travel from Huntsville to Birmingham for trial. | $900.00 |
| Return travel from Birmingham, Alabama to Huntsville, Alabama. | $467.50 |
| Travel from Birmingham to Huntsville for trial. | $900.00 |
| Travel to from Huntsville, AL to Birmingham, AL for final pretrial hearing. | $550.00 |
| Research and outline issues for pretrial conference; **travel to Birmingham**; research, review, and revise jury instruction; review privilege log. | ~~$3,500.00~~ $750.00 |
| Review of file in preparation for pretrial/status conference with Judge Manasco; communicate with S.Smith regarding same; **travel to Birmingham** for pretrial/status conference. | ~~$1,425.00~~ $562.50 |

136

| | |
|---|---|
| Return travel from Birmingham, Alabama to Huntsville, Alabama for pretrial hearing. | $467.50 |
| Communicate with defense counsel in preparation for pretrial/status conference; attended pretrial/status conference before Judge A. Manasco; follow-up conference with defense counsel regarding pretrial/status conference; telephone conference with P.Isbell regarding foregoing; **return travel to Huntsville**. | ~~$1,987.50~~ $562.50 |
| Prepare for and attend pretrial hearing before Judge Manasco; **travel to Huntsville**; research issues arising from discovery disputes over privilege log. | ~~$3,250.00~~ $750.00 |
| Review of plaintiff's filings – revised pretrial order, revised jury instructions, revised witness list and revised exhibit list; office conference with S.Smith regarding foregoing; review of direct examination of P.Isbell; **travel to Birmingham**; office conference with P.Isbell regarding review of plaintiff's responses to Isbell's discovery requests; review of case status and strategy; review of direct examination regarding Licensing Board and Protective Order issues; review of potential cross-examination issues. | ~~$2,137.50~~ $562.50 |
| **Traveled to Birmingham** for final pretrial conference; attended court hearing; office conference with M.Palmer regarding opening statement, cross-examination of M.Davies, direct examination of P.Isbell and closing argument and documents to be used during same; office conference with P.Isbell regarding direct examination and possible cross-examination; **return travel to Huntsville**. | ~~$3,937.50~~ $1,125.00 |

137

| | |
|---|---|
| Pretrial conference before Judge Manasco; **travel to and from Birmingham**. | ~~$3,250.00~~ $1,500.00 |
| Travel from Huntsville, Alabama to Birmingham, Alabama for trial. | $467.50 |
| Trial preparation – continued and completed revision of cross-examination of M.Davies; review of opening statement; review of Court's proposed voir direct examination and preliminary jury instructions; **traveled to Birmingham**; office conference with M.Palmer regarding trial exhibits and documents to be used in examination of P.Isbell and M.Davies; office conference with P.Isbell – review of direct examination and potential cross-examination; office conference with S.Smith and E.Duke regarding final trial preparation; review of opening statement; review of proposed voir dire examination. | ~~$3,450.00~~ $562.50 |
| Pack research and briefing materials for trial; travel from Huntsville to Birmingham for trial. | ~~$2,250.00~~ $750.00 |
| Fifth day of trial – Phase II jury instructions and verdict form hearing; presentation of Phase II evidence – testimony of M. Davies, P.Isbell and C.Davies; jury deliberations and verdict; confer with defense counsel; **return travel to Huntsville**. | ~~$5,175.00~~ $562.50 |
| Return travel from Birmingham, Alabama to Huntsville, Alabama after trial. | $495.00 |
| Travel from Birmingham to Huntsville following jury trial. | $1,000.00 |

The court excludes from the final fee award all entries that are solely travel time. But many of the entries including travel time are block billed such that the court cannot determine how much time was spent on each task. As discussed above, the court applies an across-the-board reduction to the final award because of the pervasive block billing. As to the block-billed entries that contain travel time, the court takes judicial notice of the average length of a commute from Huntsville to Birmingham (or vice versa)—1.5 hours—and deducts from each block-billed entry, as appropriate for the travel reflected in the entry and the attorney's hourly rate. *See Villano v. City of Boynton Beach*, 254 F.3d 1302, 1305 (11th Cir. 2001) ("The computation of a fee award is necessarily an exercise of judgment, because there is no precise rule or formula for making these determinations." (cleaned up)).

### d.  Multiple Attorneys Billing for a Task

Premier Boiler also raises allegations of impermissible duplication and inter-office meetings about Mr. Isbell's records. As explained above, the court finds nothing unreasonable about the number of attorneys working together to defend against a seven-figure damages demand that stretched more than three years, nor does it find excessive inter-office meetings reflected in the time records. After giving detailed consideration to the work performed by each attorney and carefully

139

balancing their respective contributions, the court finds no unreasonable duplication among efforts.

Just as with IB&M's attorneys, Premier Boiler seems to argue that several of Mr. Isbell's attorneys did not contribute during the trial (or did not account for such in their billing). But the court is satisfied that Mr. Isbell's attorneys played important and distinct roles at the trial. *See, e.g.*, Day 4 Tr. at 102 (giving the closing argument for Phase 1); Day 5 Tr. at 65 (conducting the direct examination of Mr. Isbell); Day 5 Tr. at 142 (giving the rebuttal for Phase 2); Day 5 Tr. at 130 (giving the closing argument for Phase 2); *Dowdell*, 698 F.2d at 1188 ("All attorneys who contribute their services to a case may be awarded reasonable attorneys' fees."). Accordingly, the court declines to cut entries on the basis that they improperly billed for more than one attorney doing the same task.

Premier Boiler also lodges several generic objections to various entries, such as "unlikely each communication with counsel regarding expert witness took exactly 18 minutes," "unlikely each communication was exactly one half hour," and "This did not take 18 minutes." *See* Doc. 234-1 at 9–10. The court declines to reduce the hours based on these speculative objections.

### e. Counterclaim

140

Premier Boiler contends that Mr. Isbell "cannot recover attorney's fees for his counterclaim because such fees are not recoverable." Doc. 234 at 2. For this proposition, Premier Boiler provides three cases that are inapposite. *See id.* at 5 (first citing *Lowery v. Thomas*, 575 So. 2d 1030 (Ala. 1990); then citing *Ex parte Edwards*, 601 So. 2d 82 (Ala. 1992); and then citing *Porter v. Hook*, 554 So. 2d 382 (Ala. 1989)). Two of the cases establish the general rule "that attorneys' fees are not recoverable as damages, in the absence of a contractual or statutory duty, and a few other exceptions on equitable principles." *Porter*, 554 So. 2d at 386; *see also Lowery*, 575 So. 2d at 1031. The third case cited by Premier Boiler states that "[t]he court should deduct for . . . hours spent on discrete and unsuccessful claims." *Ex parte Edwards*, 601 So. 2d at 86 (cleaned up).

But never does Premier Boiler explain why attorney's fees are improper here, where there is statutory authorization. Alabama Code Section 8-27-4(a)(2) specifically says, "Reasonable attorney's fees to the prevailing party if . . . [a] claim of actual or threatened misappropriation is made or resisted in bad faith." The statute does not limit the award of attorney's fees to only those incurred while litigating the misappropriation claim. *See id.* The statutory language simply provides that the prevailing party gets reasonable attorney's fees if a claim of misappropriation was

141

brought in bad faith. *See id.* The jury determined that a claim of misappropriation was brought in bad faith, and Mr. Isbell is the prevailing party. *See* Docs. 211, 212.

In any event, the counterclaim arose because Premier Boiler initiated this suit against Mr. Isbell for alleged misappropriation of trade secrets. There is no basis for a finding that the counterclaim would have been asserted otherwise. Nor any basis for a finding that the evidence on the counterclaim was entirely distinct from, and not at all relevant to, the misappropriation claim or bad faith finding. Nothing in the statute—or the authority that Premier Boiler provides—limits Mr. Isbell's recovery to only those fees attributable to the misappropriation claim and not the other claims that result from it.

If the legislature wanted to make that so, it could have done so. *See* Ala. Code § 8-27-4(a)(1) ("Recovery of any profits and other benefits conferred by the misappropriation **that are attributable to the misappropriation** . . . ." (emphasis added)). The legislature provided no such limitation, and the court declines to do so in the absence of statutory (or other) authority. Accordingly, the court will not carve out the hours spent on Mr. Isbell's counterclaim.

**2. Attorney's Professional Experience and Reputation and the Learning, Skill, and Labor Requisite to the Representation's Proper Discharge**

142

Mr. Isbell's counsel provides an affidavit from an attorney familiar with Mr. Isbell's counsel's expertise. *See* Doc. 223-1. He explains that "Mr. Smith has been practicing law for more than 25 years" and "is known on the bar for his legal acumen" and "specialized knowledge." *Id.* ¶ 10. The attorney explains that "Mr. Stephens has been practicing law for 45 years and has vast trial experience" and "is known on the bar for his work as a civil-defense trial litigator and mediator, as well as his leadership with the Alabama Defense Lawyers' Association." *Id.* ¶ 9. Premier Boiler does not challenge the professional experience and reputation of these attorneys. *See* Doc. 234 at 11.

### 3. Nature and Value of the Subject Matter of Employment and the Weight of the Attorneys' Responsibilities

The attorney affidavit submitted by Mr. Isbell explains that this case "involv[ed] more than 3 years of litigation, a substantial motion for summary judgment, a $1.7 million claim against the client, and a 5-day trial in federal court." Doc. 223-1 ¶ 13. Mr. Isbell claims that "[t]his multi-party action involved not just trade secrets but also other business tort claims" and "[t]he stakes could not have been higher for Isbell—an individual facing a $1.7 million claim for compensatory damages, to say nothing of punitive damages or attorney's fees." Doc. 241 ¶ 7. Premier Boiler contends that "[a]lthough Isbell was sued for trade secret claims, he

143

also brought a counterclaim," but Premier Boiler does not challenge the weight of the responsibilities. *See* Doc. 234 at 11.

### 4. Measure of Success Achieved

Mr. Isbell's counsel obtained a jury verdict in Mr. Isbell's favor on Premier Boiler's claim as well as a verdict that Premier Boiler brought the claim in bad faith. Docs. 211, 212. And they obtained a verdict in Mr. Isbell's favor on Mr. Isbell's counterclaim. *See* Doc. 211, 212. As with IB&M's counsel, this is the best result Mr. Isbell's counsel could have obtained.

### 5. Reasonable Expenses Incurred

Mr. Isbell lists $19,291.03 in expenses and costs. *See* Ex. 5. As explained below, Mr. Isbell may not recover certain expenses, but upon consideration, the court finds reasonable Mr. Isbell's remaining claimed expenses. *See id.*

### 6. Fixed or Contingent Fee

This factor is due no weight. *See* Doc. 241 ¶ 9 ("It is established that Isbell's attorneys worked at a fixed hourly rate, not a contingency fee . . . .").

### 7. Nature and Length of the Professional Relationship and Likelihood that Particular Employment May Preclude Other Employment

Mr. Isbell says that there is no "need for detailed consideration of the length of the professional relationship . . . [or] the preclusion of other employment." *Id.*

144

Accordingly, these factors are neutral.

### 8.  Fee Customarily Charged in the Locality for Similar Services

Mr. Isbell's counsel submitted an affidavit from an attorney "knowledgeable and experienced concerning the number of hours and rates charged by competent practitioners in this area for cases such as this one." *See* Doc. 223-1 ¶ 4. The attorney states that Mr. Smith and Mr. Stephens's rates are well "below what a lawyer of [their] caliber could charge for a case of this significance in this area." *Id.* ¶¶ 9–10. He also states that the rates for associates and paralegals are "well within the range of reasonableness." *Id.* ¶¶ 11–12.

Premier Boiler concedes that these rates are reasonable. *See* Doc. 234 at 1 ("Premier . . . does not challenge the reasonableness of the rates charged by counsel for Isbell . . . ."), 12 ("Premier does not challenge this factor."). Mr. Stephens billed at $375 an hour and Mr. Smith billed at $500 an hour. Doc. 223-1 ¶¶ 9–10. The three associates billed at $250 an hour, $300 an hour, and $385 an hour, later reduced to $275 an hour. *Id.* ¶ 11. The two paralegals billed at $200 an hour and $305 an hour, later reduced to $220 an hour. *Id.* ¶ 12.

The court finds these rates reasonable. *See Loranger*, 10 F.3d at 781.

### 9.  Time Limitations Imposed by the Client or Circumstances

145

Mr. Isbell presented no evidence that his counsel was under any time limitations or that other difficult circumstances existed in their representation of Mr. Isbell, and the court cannot readily discern any such circumstances. *See* Doc. 241 ¶ 9 (stating that this factor is not implicated). Accordingly, this factor is due no weight.

### 10. Expenses and Costs

Mr. Isbell requests $19,291.03 in expenses and costs. *See* Ex. 5. As explained above, although expenses and costs may not be recoverable under the ATSA, certain expenses and costs are recoverable under Federal Rule of Civil Procedure 54(d). *See* Doc. 223 at 1 (invoking Rule 54(d)).

#### a. Travel Expenses

For the reasons explained above, Mr. Isbell has not met his burden to be entitled to recovery of the expenses for out-of-town counsel's travel between Birmingham and Huntsville. Accordingly, the court will reduce Mr. Isbell's claimed expenses by $8,174.45, the mileage and hotel expenses claimed. *See* Ex. 5.

#### b. Copy Charges

Premier Boiler also contends that Mr. Isbell should not be allowed to recover $1,500.30 in copy charges. Doc. 234 at 7–8. Pursuant to section 1920(4), "[f]ees for

exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case" may be taxed. *See Arcadian Fertilizer, L.P. v. MPW Indus. Servs., Inc.,* 249 F.3d 1293, 1296 (11th Cir. 2001); *see also* 28 U.S.C. § 1920 (3) (allowing to be taxed as costs "[f]ees and disbursements for printing and witnesses"). Photocopies that are "necessarily obtained for use in the case" are a recoverable expense, but "general copying" costs are not. *See Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). And a party seeking copy costs must present evidence "regarding the documents copied including their use or intended use." *Cullens v. Georgia Dept. of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994). "[I]n evaluating copying costs, the court should consider whether the prevailing party could have reasonably believed that it was necessary to copy the papers at issue." *U.S. E.E.O.C. v. W & O, Inc.,* 213 F.3d 600, 623 (11th Cir. 2000).

Premier Boiler contends that Mr. Isbell has not "demonstrate[d] why it was reasonably necessary to copy the papers at issue." Doc. 234 at 8 n.4. Mr. Isbell replies that "[t]his Court's initial order requires paper courtesy copies of certain filings . . . , and it was necessary for Isbell to print hard copies of all trial exhibits in case of problems with courtroom technology." Doc. 241 ¶ 11.

The court declines to excise modest copy charges where Mr. Isbell produced

147

specific reasons for making the copies. Mr. Isbell has "show[n] the nature of the documents copied, including how they were used or intended to be used in the case." *Helms v. Wal-Mart Stores, Inc.*, 808 F. Supp. 1568, 1570 (N.D. Ga. 1992), *aff'd*, 998 F.2d 1023 (11th Cir. 1993). And Mr. Isbell did "not simply make unsubstantiated claims that such documents were necessary." *See id.*; Doc. 34 at 6 (requiring paper submissions to chambers).

Accordingly, the court will not deduct $1,500.30 in modest copy charges.

### c. Computerized Legal Research and E-Discovery Storage

Premier Boiler also contends that Mr. Isbell improperly "seeks to tax overhead materials such as legal research charges, storage charges for e-discovery, and similar expenses." Doc. 234 at 7. Mr. Isbell seeks $2,871.01 for "computerized legal research-westlaw" charges and charges for e-discovery storage. *See* Ex. 5. Mr. Isbell responds that "the charges for computerized legal research, e-discovery storage, and the like are all expenses that are routinely charged to clients and are well within the range of reasonableness of a case of this sort." Doc. 241 ¶ 10. Mr. Isbell cites an attorney affidavit for that proposition. *See id.* And Mr. Isbell contends that "Premier's counsel doubtless issued similar charges to their client." *Id.*

"The Eleventh Circuit has concluded that the costs of computerized legal

148

research may be recovered under Section 1988," *see Trotter v. Columbia Sussex Corp.*, No. CIV. A. 08-0412-WS-M, 2010 WL 383622, at *11 (S.D. Ala. Jan. 29, 2010), but has explained that section 1920 does not allow shifting of costs for computerized legal research, *see Duckworth*, 97 F.3d at 1399 (citing section 1920 and explaining that "Plaintiff's affidavits appear to include costs such as general copying, computerized legal research, postage, courthouse parking fees and expert witness fees, which are clearly nonrecoverable"); *see also Trotter*, 2010 WL 383622, at *12 (explaining that the cases disallowing computerized legal research costs "were decided under Section 1920 and/or did not apply the [section 1988] standard"); *Corsair Asset Mgmt., Inc. v. Moskovitz*, 142 F.R.D. 347, 353 (N.D. Ga. 1992) ("Computer assisted legal research, like a number of the other items that have been disallowed, have traditionally been covered in office overhead."); *Miller v. Kenworth of Dothan, Inc.*, 117 F. Supp. 2d 1247, 1266 (M.D. Ala. 2000) ("Costs incurred from 'computerized legal research' are not recoverable under § 1920."); *accord Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1272 (N.D. Ga. 2008); *In re Saf T Lok, Inc. Sec. Litig.*, No. 02-80252-CIV, 2005 WL 8156138, at *10 (S.D. Fla. June 29, 2005). Accordingly, the court will deduct $2,871.01 from the final award. *See* Ex. 5.

149

### d. Meal Expenses

Premier Boiler also asks the court to deduct meal expenses for Mr. Isbell's counsel. *See* Doc. 234 at 7. But Premier Boiler identifies no case law requiring the court to deduct meal expenses incurred during the trial. *See id.* Indeed, it identifies no case law about this issue at all, instead subsuming this in its argument about travel. *See id.* Accordingly, the court declines to deduct the meal expenses.

Accordingly, Mr. Isbell is entitled to $8,245.57 of costs and expenses and $481,333.20 in attorney's fees. The court **GRANTS IN PART** and **DENIES IN PART** Mr. Isbell's motion to award attorney's fees and costs. Doc. 223.

### 11. Fees Incurred in Litigating Post-Verdict Motions

On May 29, 2026, Mr. Isbell supplemented his petition to include fees incurred in litigating the post-verdict motions. Doc. 246. These records are attached to this order as Exhibit 6.

The court has carefully reviewed Mr. Isbell's supplemental fee petition. For the same reasons explained above, the court finds that Mr. Isbell's supplemental fees are reasonable. Premier Boiler's various objections are unavailing. *See* Doc. 249. Accordingly, Mr. Isbell is also entitled to $39,437.50 for the attorney's fees incurred in litigating the post-verdict motions. *See* Ex. 6.

150

For the reasons explained above, the court declines to award the $3,168.14 expenses incurred for e-discovery storage and for procuring the fee-petition expert affidavit.

## IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

1. IB&M's motion for sanctions is **DENIED**. Doc. 193.

2. IB&M's motion for fees and costs is **GRANTED IN PART** and **DENIED IN PART**. Doc. 224.

3. Mr. Isbell's motion to award fees and costs is also **GRANTED IN PART** and **DENIED IN PART**. Doc. 223.

4. Mr. Isbell's motion to alter or amend the final judgment is **GRANTED**. Doc. 214.

5. Premier Boiler's renewed motion for judgment as a matter of law and motion for new trial is **DENIED**. Doc. 227.

6. Premier Boiler's motion for sanctions is also **DENIED**. Doc. 228.

7. The Clerk of Court is **DIRECTED** to lift the seal on all exhibits to these motions.

8. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 31st day of July, 2026.

_____

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE